WESTERVELT v NATURAL RESOURCES COMMISSION

Docket No. 57349. Argued June 10, 1976 (Calendar No. 14).—Decided
March 20, 1978.

Albert A. Westervelt and other boat and canoe livery operators
brought a complaint against the Natural Resources Commis-
sion and the Director of the Department of Natural Resources
seeking a temporary injunction and a declaratory judgment as
to the validity of proposed "river use" rules to regulate water-
craft on the Au Sable, Manistee, Pine, and Pere Marquette
Rivers. The Lake Circuit Court, Charles A. Wickens, J., granted
judgment for plaintiffs on a finding that the defendants ex-
ceeded their statutory authority in promulgating the rules. The
Court of Appeals, V. J. Brennan, P.J., and J. H. Gillis and D. E.
Holbrook, Jr., JJ., affirmed, but held that the rules were void
because the statute delegated the rule-making power to the
DNR in an impermissibly broad manner (Docket No. 19992).
Defendants appeal. *Held:* The statutory delegation of rule-mak-
ing power is not unconstitutional. The record is inadequate to
determine whether the DNR acted within the scope of its
authority in adopting the rules, and the case is remanded to
the trial court for further findings of fact.

Justice Williams, joined by Justices Levin and Fitzgerald,
wrote:

1. The test for determining whether legislation constitutes an
unconstitutional delegation of legislative power to an adminis-
trative agency is the "standards test": the delegation of power
must contain, either explicitly or by reference, standards for
guidance of the agency as reasonably precise as the subject
matter requires or permits. A delegation which complies does

REFERENCES FOR POINTS IN HEADNOTES

[1–5, 7–12] 1 Am Jur 2d, Administrative Law § 98 *et seq.*
16 Am Jur 2d, Constitutional Law §§ 240, 257.
[4–7, 10] 61 Am Jur 2d, Pollution Control §§ 69–73.
78 Am Jur 2d, Waters §§ 76, 77.
Validity and construction of anti-water pollution statutes or ordi-
nances. 32 ALR3d 215.
[5, 12] 2 Am Jur 2d, Administrative Law §§ 279, 281
[11] 2 Am Jur 2d, Administrative Law §§ 650–652.

not violate the constitutional principle of separation of powers because the administrative agency is acting within specified limitations established by the Legislature and is not acting in accordance with its own uncircumscribed will.

2. However, the "standards test", in its present form, is not in every case an effective means of assuring due process protection. In some instances it is not possible, nor even desirable, to require legislative standards of a carefully detailed nature. But the broader, the more flexible, the legislative standards, the less the people are protected from potential abuse of discretion by administrative officials. Accordingly, if the "standards" afforded provide little or no actual due process protection, a court should, in balance, determine whether a sufficient totality of safeguards exist.

3. The challenged legislation in the instant case includes standards as reasonably precise as the subject matter of the legislation, agency protection and conservation of natural resources, requires or permits. The statutory language "prevent and guard against the pollution of lakes and streams" and "molestation", "spoilation", "destruction", and "improper use or occupancy" acquires its meaning from our state's developing and evolving common law of environmental quality. The standards are necessarily and properly painted with a rather broad stroke of the brush.

4. The legislative standards at issue provide, in themselves, insufficient due process protection. However, the Administrative Procedures Act (APA) is in full effect with respect to any rule-making by the Department of Natural Resources. The APA requires that the agency adhere to detailed extensive procedural requirements when engaged in rule-making. Also, the Natural Resources Commission's high degree of proximity to the elective process, through appointment of members by the Governor and confirmation by the Senate, is a substantial factor assuring that the public is not left unprotected. Therefore, the delegation of rule-making power to the Department of Natural Resources and the Natural Resources Commission pursuant to this statute is a constitutionally valid delegation of legislative power.

5. The present state of this record does not allow the Court to adequately answer whether a state of facts exists that justifies regulation of the use of the rivers in question and whether the regulations adopted are reasonably related to protection of the rivers. It does not appear that the trial judge considered the materials presented by stipulation of the parties from the three public hearings and from the Natural Resources Commission

proceedings on these regulations. On remand, this material should be entered into the record to aid the trial court in resolving the issue whether the river use rules exceed the scope of the DNR's statutory authority.

6. On remand, the trial court should make the following preliminary findings:

(1) Whether there is in fact and to what extent there is existent or threatened "pollution", "molestation", "spoilation", or "destruction" with respect to each of the rivers sought to be regulated by the proposed rules;

(2) assuming there is existent or threatened "pollution", "molestation", "spoilation", or "destruction" with respect to each river, whether the river use rules are, in fact, related to the prevention of these conditions. With respect to this finding, the court should question: (a) whether the passage of watercraft relates to the "pollution", "molestation", "spoilation", or "destruction" of each of the rivers sought to be regulated by the proposed rules; (b) whether the numbers of and kind of watercraft allowed under the river use rules relates to the prevention of "pollution", "molestation", "spoilation", or "destruction" of each of the rivers sought to be regulated by the rules; (c) whether the two "seasonal time zones", one restricting watercraft use, the other permitting it, are related to the density of watercraft use during these times.

Justice Ryan, with Chief Justice Kavanagh and Justice Coleman concurring, agreed that the Legislature did not delegate its law-making power to the department in violation of the constitutional separation of powers. However, he did not agree that the delegation doctrine is also grounded in constitutional due process. The due-process issue involves a separate and distinct inquiry to ascertain whether adequate procedural safeguards have been provided to assure the protection of the rights of any party affected by the agency's exercise of its authority. In evaluating whether there is actual or potential abuse in the agency's exercise of its discretion, a court may look to a number of sources including the legislative policy declaration made in the act which authorizes the agency action, the procedural safeguards that govern the agency in the exercise of its powers, the provisions for legislative supervision of the agency's actions, and the provisions for judicial review. The legislation under consideration requires the Natural Resources Commission to follow the provisions of the Administrative Procedures Act, which are sufficient to insure the proper protection of the due-process rights of any person who might be affected by the agency's action if the procedures are followed by

the agency. However, the record in the instant case is inadequate to determine whether the Department of Natural Resources was acting within the scope of its properly delegated authority when it adopted these river use rules and whether, in fact, it afforded all the affected parties sufficient due process safeguards when it exercised that authority.

Justice Blair Moody, Jr., did not participate in the decision of the case.

The decision of the Court of Appeals is reversed and the case is remanded to the trial court for further proceedings.

62 Mich App 539; 233 NW2d 640 (1975) reversed.

OPINION BY WILLIAMS, J.

LEVIN and FITZGERALD, JJ.

1. ADMINISTRATIVE LAW—DELEGATION OF POWERS—STATUTES—STANDARDS—SEPARATION OF POWERS.

The test for determining whether legislation constitutes an unconstitutional delegation of legislative power to an administrative agency is the "standards test"; the legislation must contain standards for guidance of the agency as reasonably precise as the subject matter requires or permits to comply with the constitutional doctrine of separation of powers.

2. ADMINISTRATIVE LAW—DELEGATION OF POWERS—RULES.

Rule-making by an administrative agency is not a usurpation of the legislative law-making function in violation of the constitutional doctrine of separation of powers where the Legislature has authorized the agency to make administrative rules and has limited the scope within which the agency may act because the agency acts within specified limitations or standards established by the Legislature and not in accordance with the agency's own will.

3. ADMINISTRATIVE LAW—DELEGATION OF POWERS—STATUTES—DUE PROCESS.

*Legislation in which power is delegated to an administrative agency, for purposes of satisfying the Due Process Clause of the Constitution, must afford a sufficient totality of safeguards, including "standards", which assure that the public will be protected against potential abuse of discretion at the hands of administrative officials (Const 1963, art 1, § 17).*

4. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES—RULES—DELEGATION OF POWERS.

The statutory language which grants the Department of Natural

Resources the authority to promulgate rules and regulations to prevent and guard against the pollution of lakes and streams provides standards for the administrative agency as reasonably precise as the subject matter of the legislation, the protection and conservation of our natural resources, requires or permits (MCL 299.3, 299.3a; MSA 13.3, 13.4).

5. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES —RULES—DUE PROCESS.

*The high degree of proximity of the Natural Resources Commission, whose members are appointed by the Governor and confirmed by the Senate, to the elective process, and the procedural safeguards required by the Administrative Procedures Act afford a sufficient totality of safeguards to satisfy due process when the commission is engaged in making river use rules pursuant to statutory delegation of powers (Const 1963, art 1, § 17; MCL 24.201 et seq., 299.3, 299.3a; MSA 3.560[101] et seq., 13.3, 13.4).*

6. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES —RULES—CONSTITUTIONAL LAW.

The statute which authorizes the Department of Natural Resources and the Natural Resources Commission to promulgate river use rules is a constitutionally valid delegation of legislative power (MCL 24.201 *et seq.,* 299.3, 299.3a; MSA 3.560[101] *et seq.,* 13.3, 13.4).

7. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES —RULES—DELEGATION OF POWERS.

Whether river use rules promulgated by the Department of Natural Resources are invalid because the agency exceeded the scope of its delegated authority depends on whether (1) a state of facts exists that justifies regulation of the use of the rivers in question, and (2) the regulations are reasonably related to preventing and guarding against pollution of lakes and streams and preserving them from molestation, spoliation, destruction, or any improper use or occupancy (MCL 299.3, 299.3a; MSA 13.3, 13.4; 1972 AACS, R 299.2701 *et seq.).*

OPINION BY RYAN, J.

KAVANAGH, C.J., and COLEMAN, J.

8. ADMINISTRATIVE LAW—DELEGATION OF POWERS—CONSTITUTIONAL LAW.

*The Constitution prohibits the Legislature from delegating its*

*lawmaking powers to an administrative agency in the executive branch of government solely because such a delegation violates the separation of the powers of government into the legislative, executive and judicial branches (Const 1963, art 3, § 2).*

9. ADMINISTRATIVE LAW—DELEGATION OF POWERS—STANDARDS.

*The Legislature may properly authorize an administrative agency to exercise certain powers when fulfilling its legislatively created duties and responsibilities, provided the Legislature prescribes standards as reasonably precise as the subject matter requires or permits when conferring regulatory and rule-making authority on the agency (Const 1963, art 3, § 2).*

10. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES —RULES—DELEGATION OF POWERS.

*The protection and conservation of our natural resources requires a high level of expertise; the statutory language which grants the Department of Natural Resources the authority to promulgate rules and regulations for specified purposes provides standards to govern the department in the exercise of its rule-making authority which are as reasonably precise as the subject matter requires or permits (Const 1963, art 3, § 2; MCL 299.3, 299.3a; MSA 13.3, 13.4).*

11. ADMINISTRATIVE LAW—DELEGATION OF POWERS—DUE PROCESS— ABUSE OF DISCRETION.

*A court determining whether there is actual or potential abuse of discretion in an administrative agency's exercise of its delegated powers which would violate due process may look to a number of sources including the legislative declaration of policy in the act which authorizes the agency actions, the procedural safeguards that govern the agency in the exercise of its powers, the provisions for legislative supervision of the agency's actions, and the provisions for judicial review (Const 1963, art 1, § 17).*

12. HEALTH AND ENVIRONMENT—DEPARTMENT OF NATURAL RESOURCES —RULES—ADMINISTRATIVE PROCEDURES ACT—DUE PROCESS.

*The statute which grants the Department of Natural Resources the authority to promulgate rules and regulations for specified purposes requires the department to follow the provisions of the Administrative Procedures Act when promulgating any rules; these rule-making procedures are sufficient to insure the proper protection of the due-process rights of any person who might be affected by the department's action, if the procedures are followed by the department (Const 1963, art 1, § 17; MCL 24.201 et seq., 299.3a; MSA 3.560[101] et seq., 13.4).*

*Ronald C. Wilson* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jerome Maslowski* and *Thomas L. Casey,* Assistants Attorney General, for defendants.

WILLIAMS, J. This case comes to us on appeal from a declaratory judgment. There are two issues: (1) whether the Legislature, in conferring authority upon the Department of Conservation and the Commission of Conservation[1] to promulgate rules and regulations pursuant to §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a; MSA 13.3, 13.4, unconstitutionally delegated its legislative power; and (2) whether the "river use rules" promulgated by the successor Department of Natural Resources are invalid because the agency exceeded the scope of authority granted to it by the Legislature under §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a; MSA 13.3, 13.4.

With respect to issue (1), we hold that §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a; MSA 13.3, 13.4, do not unconstitutionally delegate legislative power to the agency. Accordingly, we reverse the Court of Appeals and the trial court as to this issue. With respect to issue (2), we remand to the trial court for proceedings not inconsistent with this opinion. We also remand to the trial court, without prejudice, with respect to the other issues to which the parties stipulated but which were not considered at trial.

---

[1] *See* Executive Orders 1973-2 and 1973-2a, MCLA 299.11; MSA 13.20(1) in which, effectively, the powers of the Department of Conservation and the Commission of Conservation are transferred, respectively, to the Department of Natural Resources and the Natural Resources Commission. See also 1975 PA 128, MCLA 299.2; MSA 13.2.

## I—FACTS

In 1971 and 1972 the Department of Natural Resources (the DNR) conducted a series of extensive meetings and hearings, the result being, in March, 1972, the promulgation of a set of rules (the "river use rules") designed to regulate the use of certain portions of the Au Sable, Manistee, Pine, and Pere Marquette Rivers. 1972 AACS, R 299.2701 *et seq.* The authoritative source for these rules, according to the DNR, was §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a; MSA 13.3, 13.4.

The Joint Rules Committee of the Legislature entered actively into the formulation of the "river use" rules. A special hearing of the Joint Rules Committee was held April 18, 1972, to hear the DNR "River Rules" Committee and other DNR staff concerning the rules. On April 27, 1972, the Joint Rules Committee held another meeting to question the DNR. Apparently, as a result of these meetings, the Joint Rules Committee suggested changes in the rules, which, after DNR discussion, were discussed with legislators and the Legislative Service Bureau. After revision pursuant to these contacts, further minor revisions were made at the suggestion of the Joint Rules Committee on June 1, 1972. The Joint Rules Committee adopted the rules on June 6, 1972.

The "river use" rules, in general, divide portions of the rivers into sections and designate the uses to which these sections of the rivers may be put. On certain sections of the rivers, the rules prohibit the use of any type of watercraft, while on other sections, non-motor watercraft or motor watercraft operating at slow, non-wake speeds are the only types of watercraft permitted to be operated. The rules provide that they are to be in effect from the

last Saturday in April through Labor Day; they do not apply during the remainder of the year. The rules also specify certain responsibilities of river users and impose certain duties on livery operators or other persons who have watercraft for rent. These rules, however, apply only to those persons who have watercraft for rent "in a stretch of a river designated for non-motor watercraft use" or those persons who use a "stretch of a river designated for non-motor watercraft use". 1972 AACS, R 299.2709, 299.2710. Finally, the rules provide release and pickup points for watercraft and establish a scheme whereby a permit is required to be carried in all watercraft using these portions of the rivers designated for non-motor watercraft use. Such permits are available on a limited basis only, and the number of available permits is scheduled to decrease over a period of years. Violation of any of these rules is stated to be a misdemeanor under the provisions of MCLA 299.3a; MSA 13.4.

On April 27, 1972, plaintiffs, who are boat and canoe livery operators, brought this action against defendants Natural Resources Commission and Ralph A. MacMullan, Director of the DNR, seeking (1) a temporary injunction against enforcement of the proposed rules, and (2) a declaratory judgment as to the validity of the proposed rules. In a rather elaborate complaint, plaintiffs essentially alleged that (1) the rules "if finally 'promulgated' and carried into effect and enforced by the department, would be unconstitutional and would represent an unconstitutional assumption of authority by the department" because the Legislature had not delegated to the DNR the authority to promulgate such rules, that the rules, if carried into effect, would result in a taking of business opportunities and properties which amounts to a taking of

property without due process of law, and that the rules were discriminatory and in violation of the equal protection of the laws; (2) the rules are invalid and unenforceable because the DNR failed "substantially to comply with the requirements of the Administrative Procedures Act of 1969" (the APA).

On April 28, 1972, the circuit court entered a temporary order restraining the DNR from effectuating or attempting to enforce the rules, ordering the DNR to show cause why the temporary order should not be made a temporary injunction pending determination of the cause. On May 10, 1972, the date scheduled for the show-cause hearing, the circuit court issued an order, stipulated to by all parties, that the temporary restraining order be modified to permit administrative procedural matters to continue with respect to the rules, but the court continued the restraining order against enforcement of the rules. Defendants thereafter answered plaintiff's complaint, and filed a motion for summary judgment under GCR 1963, 117.2(1) (this motion was subsequently withdrawn in the "stipulation" discussed *infra).*

On September 11, 1972, it was "stipulated and agreed between counsel for the respective parties" that the case would be submitted to the court "for a declaratory ruling" on nine stipulated legal issues. Trial was held on November 23, 1973, on the basis of the pleadings, stipulated issues and exhibits, written briefs and oral argument. The stipulation, in addition to the agreed-upon issues, contained the following extremely meager facts and the unfortunate record-limiting stipulation "to insure the non-introduction of factual matter in a case where, by stipulation, the legal issues only are to be argued". This record limitation is coun-

terproductive because some of the legal issues raised can only be resolved in the context of the surrounding and, because of the stipulation and trial method, missing facts. The applicable excerpt from the stipulation is:

"It is further stipulated and agreed that for the purpose and only for the purpose, of the declaratory consideration, it is specified that there was and is conduct, conflict of use, pollution and other injury to the natural resources on the streams in question sufficient to justify concern by the Department of Natural Resources and some form of regulation of river use.

"That as to those plaintiffs doing business in the controlled river stretches, it is agreed for the purposes of this case that there would be a diminution of profit if the permit system of use is instituted.

"This stipulation is to insure the non-introduction of factual matter in a case where, by stipulation, the legal issues only are to be argued.

"It is also further stipulated and agreed:

"1. That the various drafts of the proposed 'River Use Rules' with dates of publication, the transcript of testimony taken at the three public hearings, the transcript of commission meetings when rules were considered, the chronological schedule of events, the technical reports and the report to the joint committee all be submitted and that these documents be used by the court in its deliberation and judgment."

The issue at trial was framed as "the legality of the final draft of 'The Department of Natural Resources Use of River Rules'". After hearing arguments on both sides as to the legal issues involved, the court, by opinion dated January 2, 1974, found "the authority lacking in the Department of Natural Resources by legislative grant to promulgate the rules in question as they are finally drafted". As to the other allegations complained of by plaintiffs, the court stated that "[o]n

these matters, the court passes no opinion as to the validity of the rules". Subsequently, defendants filed a motion for the amendment of findings and for additional findings, and a hearing was held pursuant to this motion. The trial court replied pertinently to this motion as follows:

"In this particular case, there was no testimony taken and all of the facts presented were presented by a stipulated set of facts and the court made no finding of facts. The facts were all agreed to by the attorneys in the case. Therefore, to make an additional finding of fact would be a relief not provided for by legal procedure and would, in fact, corrupt the record and make the case readily defective and appealable, because the judge would be interjecting into the stipulated facts something not in the stipulated facts. Therefore, that portion of the motion which asks for an additional finding of fact should be and is hereby denied as not being proper in this case. There was one fact inserted in the record not in the finding of fact agreed upon. This was the fact in the opinion as to the number of river users on the rivers in question on a weekend and the amount of money involved in these activities. This fact was interjected into the record as an admission of fact at the time oral arguments were made and it becomes part of the record like the stipulated set of facts, because an admission of attorneys is to be used by the trier of the facts in determining the facts, the same as any other evidence."

On April 1, 1974, judgment in favor of plaintiffs was entered. The court emphasized that "the sole issue upon which the court decided this case was whether or not the Natural Resources Commission had authority under 1921 PA 17 to promulgate the rules in question". Defendants appealed this judgment to the Court of Appeals.

The Court of Appeals phrased the "sole issue" for its consideration "the question of whether the

defendants exceeded their authority in promulgating the complained of rules". 62 Mich App 539, 542; 233 NW2d 640 (1975). However, in its analysis of this issue, the Court stated that the argument that the Legislature granted the DNR authority to pass the rules complained of, "if it is to succeed at all, must have as its basic premise the proposition that the rule-making power conferred by MCLA 299.2; MSA 13.2 confers on the Department of Natural Resources the power to pass such rules in order to effectuate the duties imposed by MCLA 299.3; MSA 13.311. 62 Mich App 539, 543. Looking to this "premise", the Court stated that "[t]he act * * * provides no specific method by which the department is to effectuate" the purpose of the act (stated, in part, in MCLA 299.3; MSA 13.3).

"[N]or does it even indicate what types of procedures are contemplated. The Act attempts to delegate complete control of this area of state concern to the Department of Natural Resources without providing the agency with any workable standards by which it is to be guided in the performance of its task, as is required by present Michigan law. *Saginaw v Budd,* 381 Mich 173; 160 NW2d 906 (1968), *O'Brien v State Highway Commissioner,* 375 Mich 545; 134 NW2d 700 (1965); *Osius v St Clair Shores,* 344 Mich 693; 75 NW2d 25 (1956).

*   *   *

"The present statutes * * * attempt to give the Department of Natural Resources the authority to do so in an impermissible manner. The present statutes sweep too broadly and are not amenable to any saving construction. Such statutes must designate in greater detail the types of programs and remedies the department has the authority to implement and establish standards to guide the department in the exercise of their discretion." 62 Mich App 539, 544–545.

For this reason, the Court held the complained-of

rules "void and of no force or effect since they were promulgated pursuant to a statute which delegates rule-making power to the Department of Natural Resources in an impermissible manner". 62 Mich App 539, 545.

Defendants appealed to this Court, stating that the case

"has narrowed down to the issue of whether or not there has been delegated to the Department of Natural Resources authority to promulgate these rules under 1921 PA 17 as amended. The Lake County Circuit Court said no and this was affirmed by the Court of Appeals, Division 3. In affirming the lower court the Court of Appeals said that 1921 PA 17, as amended, lacked standards to guide the department—that the delegation of authority was too broad and that the delegation was not helped by any other act."

We granted leave October 1, 1975.

## II—INTRODUCTION

We perceive two issues in this case: (1) whether the Legislature, in conferring authority upon the Department of Conservation and the Commission of Conservation to promulgate rules and regulations pursuant to §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a; MSA 13.3, 13.4, unconstitutionally delegated its legislative power; (2) whether the "river use rules" promulgated by the successor Department of Natural Resources are invalid because the agency exceeded the scope of authority granted to it by the Legislature under §§ 3 and 3a of 1921 PA 17, as amended; MCLA 299.3, 299.3a.

As is apparent, the second issue is, legally, interrelated to resolution of the first. The thresh-

old, and crucial, issue in this case is the "delega-
tion" issue.

We note, at the outset, that the important and
ever-occurring legal question of whether particular
legislation constitutes an unconstitutional "delega-
tion of power" to administrative agencies is, and
has been, the subject of extensive critical debate
among some of our most eminent scholars.[2] We
also note that this area of the law is, and has
been, relatively speaking, in a state of flux in both
state and Federal courts for over a hundred years.[3]

Also, we must emphasize that the interests af-
fected by the rules and regulations promulgated by
the DNR in issue before us touch societal interests
of great magnitude. On the one hand, there exists
the public interest in protecting and preserving
some of the most precious waterways in the world.
On the other hand, there exist the private inter-
ests of persons who make their livelihood from
these waterways and the interests of persons who
use these waterways for their recreational plea-
sure.

Accordingly, because of the difficult and rela-
tively controversial nature of the legal question of
the "delegation of legislative power to administra-
tive agencies" and because of the important socie-

[2] See, especially, 1 Cooper, State Administrative Law, ch 3, "Delega-
tion of Powers"; 1 Davis, Administrative Law Treatise and Adminis-
trative Law of the Seventies supplementing Administrative Law
Treatise, ch 2, "Delegation of Power"; Jaffe, Judicial Control of
Administrative Action, ch 2, "Delegation of Legislative Power", pp
28–86; Merrill, Standards—A Safeguard for the Exercise of Delegated
Power, 47 Neb L Rev 469 (1968); Leventhal, Principled Fairness and
Regulatory Urgency, 25 Case Western Reserve L Rev 66 (1974).

[3] With respect to the development of the "delegation doctrine" in
the Federal courts, see Jaffe, Judicial Control of Administrative
Action, supra, pp 51–73. With respect to the development of the
"delegation doctrine" in state courts, see the excellent and compre-
hensive discussion of Professor Cooper, 1 Cooper, State Administra-
tive Law, supra. See also Jaffe, Judicial Control of Administrative
Action, supra, pp 73–85.

tal interests affected by the "delegation of legislative power" in issue, we believe it is appropriate, as an initial measure, to discuss in historical depth the constitutional underpinnings of the "delegation doctrine".

### III—DISCUSSION OF THE CONSTITUTIONAL QUESTION OF THE DELEGATION OF LEGISLATIVE POWER TO ADMINISTRATIVE AGENCIES AS IT HAS DEVELOPED IN OUR JURISPRUDENCE

The constitutional question of whether the Legislature can delegate its power to an administrative agency, as it developed in our jurisprudence during the nineteenth century and into the twentieth century, was fully discussed for the first time by our Court in *King v Concordia Fire Insurance Co,* 140 Mich 258; 103 NW 616 (1905). See also *Michigan C R Co v Michigan Railroad Commission,* 160 Mich 355; 125 NW 549 (1910). In *King,* this Court grounded the "delegation" question in the principle of the separation of powers as expressed in art 4, § 1 of our Constitution of that time which provided that "the legislative power is vested in the senate and house of representatives". 140 Mich 258, 267.[4] This Court began its analysis of the doctrine by quoting, with approval, from Justice COOLEY's Constitutional Limitations, in support of the "well-settled" principle "that such power cannot be delegated":

"One of the settled maxims in constitutional law is

---

[4] Our present Constitution includes precisely this same language in art 4, § 1. See also art 3, § 2 of our Constitution entitled "Separation of powers of government", which states:

"The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the Constitution itself is changed. The power to whose judgment, wisdom, and partriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust." Cooley, Constitutional Limitations (6th ed), p 137.

This Court, however, then enunciated two conceptually related "tests" to distinguish analytically between "truly legislative" powers, which could not be delegated, and those which are merely "administrative" and could be delegated.[5] First, this Court declared,

"The proper distinction between such delegated power [power of 'an administrative character'] and legislative power is stated in *Locke's Appeal,* 72 Pa 491, 498 [1873], as follows:

" 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to[6] make, its own action depend.' "

---

[5] See *People v Collins,* 3 Mich 343, 415–416 (1854), where Justice Douglass elaborated on this distinction (agreed with by a unanimous Court):

"That the legislature may confer upon others, in their discretion, *administrative* powers necessary or proper for carrying on the government, not otherwise vested by the Constitution, and in some cases involving the exercise of discretion which the legislature itself might, but could not conveniently have exercised, no one will question. These, however, are not the law-making powers." (Emphasis in original.)

[6] The Pennsylvania court added that "[t]o deny this would be to stop the wheels of government". 72 Pa 491, 499.

Second, this Court articulated another "true distinction", quoting with approval from the opinion of Justice Ranney in *Cincinnati, W & Z R Co v Clinton County Commissioners,* 1 Ohio St 77, 88 (1852), that

"[t]he true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no[7] valid objection can be made."

This Court then, applying both the "proper distinction" from *Locke's Appeal* and the "true distinction" from *Cincinnati, W & Z R Co v Clinton County Commissioners* as the "tests" for determining whether there had been an unconstitutional delegation of "legislative" power in the case before it, held the statute in issue[8] "was not administrative, but was legislative". This Court reasoned:

"It cannot be said that the legislature merely delegated to the commission power to determine 'a fact or state of things upon which the law makes, or intends to make, its own action to depend;' nor that it merely delegated to the commission 'discretion as to its execution to be exercised under and in pursuance of the law.' " 140 Mich 258, 269.

---

[7] Professor Frank Cooper, in his treatise State Administrative Law, notes that this "true test" "has been reverently repeated thousands of times" by state courts. 1 Cooper, State Administrative Law, *supra,* p 49.

[8] At issue in *King* was the constitutional validity of the Michigan standard policy law of 1881 (1881 PA 149) which, in the Court's words, empowered a newly created insurance commission "which was a body having continuous existence, to alter or amend the form so adopted by them 'whenever they shall deem it necessary.' " It also empowered the commissioner of insurance "to fix the time when the use of the form of policy so adopted or amended 'shall become obligatory,' and prohibited thereafter, under penalty, the making of contracts of fire insurance, except in accordance with said form as so altered or amended." 140 Mich 258, 267.

As the twentieth century progressed, our Court abandoned the specific analytical approach of the two "tests" advanced in *King.*[9] Instead, this Court chose to formulate in an evolutionary and unordered manner a new "test" for determining the validity of a delegation of "legislative" power. Essentially, this Court began to require that the delegation of "legislative" power to administrative agencies be limited by the imposition of "defined legislative limits" or legislatively prescribed *standards.* Importantly, the earliest cases articulating the so-called "standards test" reveal two distinct constitutional foundations.

First, the "standards test" appears to have "replaced" the earlier two tests regarding delegation enunciated in *King* as the basis for the "true" or "proper" distinction between the delegation of truly "legislative" power, which could not be constitutionally delegated, and those "administrative" powers which could be delegated to agencies. This Court, in *People v Soule,* 238 Mich 130, 139; 213 NW 195 (1927), reasserted the general constitutional dictum, rooted in the separation of powers, that "[t]he Legislature cannot delegate its power to make a law" (quoting *Locke's Appeal, supra*). However, this Court reasoned that

"[t]he commission in promulgating administrative orders *within* defined *legislative limits* to carry out the

---

[9] It is difficult to ascertain exactly why this Court chose to abandon, as specific analytical "tests", the two "tests" enunciated in *King.* Perhaps the essential reason is the fact that the "standards test" "early gained * * * widespread popularity * * * as the real 'true test' by which validity of delegations must be judged". 1 Cooper, State Administrative Law, p 54.

Professor Cooper also observed that the language of these "true tests" continued to be repeated in court opinions, see, *e.g., People v Saule,* 238 Mich 130; 213 NW 195 (1927), although the specific analytical method of the tests was no longer employed. 1 Cooper, State Administrative Law, *supra,* pp 51–52.

expressed will of the legislature *makes no new law.* It but exercises a discretion *on ascertained conditions* under and in pursuance of the law." (Emphasis added.) 238 Mich 130, 139.

Thus, this Court implicitly stated, when legislation contains "defined legislative limits" and "ascertained conditions" *(i.e.,* "standards"), agency rule-making within these "limits" and in accord with these "conditions" is not, in fact, "law-making" and is therefore not an unconstitutional violation of the separation of powers.

The second constitutional foundation for the "standards test" which evolved was due process. This constitutional foundation of the test was fully expressed by the Court in *Hoyt Bros, Inc v Grand Rapids,* 260 Mich 447; 245 NW 509 (1932) (although earlier cases had hinted at its "due process" basis).[10] At issue in *Hoyt Bros* was a city ordinance which vested in the city manager the power to grant licenses for activities such as solic-

---

[10] See, *e.g., Devereaux v Genesee Twp Board,* 211 Mich 38; 177 NW 967 (1920). At issue in *Devereaux* was a statute which conferred upon township boards the power to grant or refuse licenses to conduct pool rooms, dance halls, and the like. 211 Mich 38, 39–40. This Court held, although it did not articulate the precise constitutional basis for its decision, that:

"The statute in question provides no method for the application for licenses, contains no qualifications which the applicant must possess, provides no standard of fitness, makes no provisions as to the character of the structure or equipment to be used in the business regulated. It, in fact, attempts to confer upon the township board the arbitrary power to grant or refuse a license, according to its whim or caprice. Under all the authorities, we think this cannot be done. *Robison v Miner,* 68 Mich 549 [37 NW 21 (1888)]; *Yick Wo v Hopkins,* 118 US 356; 6 S Ct 1064 [30 L Ed 220 (1886)]; *Mayor of Baltimore v Radecke,* 49 Md 217 [1878]; *Gundling v Chicago,* 177 US 183; 20 S Ct 633 [44 L Ed 725 (1900)]; *Darling v St Paul,* 19 Minn 389 [1872]." 211 Mich 38, 43.

See also, *Harrigan & Reid Co v Burton,* 224 Mich 564; 195 NW 60 (1923), *G F Redmond & Co v Michigan Securities Commission,* 222 Mich 1; 192 NW 688 (1923), *Postal v Village of Grosse Pointe,* 239 Mich 286; 214 NW 148 (1927), *Samuels v Couzens,* 222 Mich 604; 193 NW 212 (1923).

iting funds or selling goods "for charitable pur-
poses * * * whenever it shall appear to the city
manager * * * that the charity is a worthy one
and that the person or persons making the appli-
cation are fit and responsible parties". 260 Mich
447, 449–450. This Court agreed with appellant's
contention that the ordinance, as written, violated
the then art 2, § 16 of our Constitution, which
declared, "[n]o person shall be * * * deprived of
life, liberty or property, without due process of
law".[11] This Court cited with approval language
from a headnote of an earlier case, *Hughes v
Detroit,* 217 Mich 567; 187 NW 530 (1922), which
ruled:

"Where an ordinance states a standard for the guid-
ance of the mayor in granting licenses thereunder, and
his official discretion to grant or refuse a license upon
investigating the facts is limited to determining
whether the requirements prescribed by the ordinance
have been met, and an abuse of discretion would be
subject to review, it cannot be said that the ordinance is
invalid because it delegates uncontrolled licensing
power to him, with authority to arbitrarily grant or
refuse." *Hughes v Detroit,* 217 Mich 567, headnote 2.

This Court then held:

"In the instant case the power to issue a permit is
vested in the city manager who grants such permit
'whenever it shall appear * * * from such investigation
and report (made by a police officer) that the charity is
a *worthy one,* and that the person or persons making
the application are *fit and responsible.'* The ordinance
contains no rule or provision by which the city manager
is to determine whether the charity is 'worthy' or the

_____

[11] The due process clause in our present Constitution is found in art
1, § 17. The language is identical to the constitutional language
quoted in *Hoyt Bros, Inc, supra.*

applicant is 'fit and responsible.' In making his determination he may apply one or more of a great variety of qualifications which to the city manager may seem proper, or he may grant or refuse the permit solely on captious grounds. And he may apply one test to one applicant and another to another. The ordinance does not contain the slightest indication of the kind or character of charity that is a 'worthy one;' and likewise it is wholly silent as to what type of qualification would constitute an applicant for a permit 'fit and responsible.' We see no escape from the conclusion that the ordinance attempts to vest the city manager with an arbitrary power in the exercise of which he will say to one applicant 'yes,' and to another 'no.'" 260 Mich 447, 451–452.

This Court declared that its decision was

"controlled by the legal proposition that it is requisite to the validity of the ordinance that it should state 'a standard for the guidance' of the official who passes upon the application for the permit. *Hughes v Detroit, supra.* The general and indefinite terms used in this ordinance wholly fail to comply with this requisite." 260 Mich 447, 452.[12]

By the mid-1930's, the "standards" test was firmly rooted in Michigan jurisprudence as the proper test for determining the validity of legislative delegation of power.[13] The next significant development of the "standards test" was in the landmark case, *Osius v St Clair Shores,* 344 Mich 693; 75 NW2d 25 (1956).

At issue in *Osius* were §§ 6-B and 10 of a St.

---

[12] These two "constitutional foundations" of the "standards test" developed by our Court echo what Professor Merrill refers to as the doctrine's "twofold ancestry" in state courts. Merrill, *Standards—A Safeguard for the Exercise of Delegated Power, supra,* pp 469–471.

[13] See, *e.g., Argo Oil Corp v Atwood,* 274 Mich 47; 264 NW 285 (1935), *Milk Marketing Board v Johnson,* 295 Mich 644; 295 NW 346 (1940).

Clair Shores zoning ordinance, which was described by the Court as follows:

"[Plaintiffs] point to section 6-B of the zoning ordinance (which allows service stations in a business B district 'only when permitted by the board of appeals as specified in section 10, paragraph 10 hereof') and, in turn, to section 10 thereof. The latter section, entitled 'Board of Appeals,' permits the board to vary or modify the application of the regulations, 'in harmony with their general purpose or intent,' following which it is provided that no service stations may be permitted in business B districts 'except after an advertised public hearing.'" 344 Mich 693, 697–698.

The plaintiffs in *Osius,* in the words of the Court, "complain primarily that the zoning board of appeals is exercising, by delegation, a legislative function, which they condemn as unconstitutional, and that this delegated legislative function *is exercised without guide or standard*" (emphasis added), 344 Mich 693, 697.

The Court's analysis of this issue in *Osius* is significant for essentially two reasons. First, *Osius* is significant because the Court, in its analysis, affirmed both "separation of powers" and "due process" constitutional foundations of the "standards test". With respect to the "separation of powers" foundation, the Court ruled:

"*There is no doubt that a legislative body may not delegate to another its lawmaking powers. It must promulgate, not abdicate.* This is not to say, however, that a subordinate body or official may not be clothed with the authority to say when the law shall operate, or as to whom, or upon what occasion, provided, however, that the standards prescribed for guidance are as reasonably precise as the subject matter requires or permits." (Emphasis added.) 344 Mich 693, 698.

And, with respect to the "due process" foundation, the Court ruled "[w]ithout definite standards an ordinance becomes an open door to favoritism and discrimination, a ready tool for the suppression of competition through granting of authority to one and the withholding from another", 344 Mich 693, 700, citing with approval the reasoning and analysis of *Devereaux v Township Board* (see fn 10, *supra)* and *Hoyt Bros, Inc v Grand Rapids* (see discussion *supra)* as authority for its conclusion.[14]

Finding that there were no standards whatsoever in the ordinance in issue, the Court held the ordinance unconstitutional, its implicit rationale being that the ordinance violated due process in permitting "administrative officers or boards to pick and choose the recipients of their favors". 344 Mich 693, 700–701.

Second, and more importantly, *Osius* is significant because it expressed unequivocal judicial recognition by this Court of the fact that "standards prescribed for guidance" need only be "as reasonably precise as the subject matter requires or permits". 344 Mich 693, 698.[15]

Although this Court did not cite any authority

[14] This Court did not explicitly ground its rationale in the due process clause of our Constitution, although such constitutional basis can be implied from the fact that the Court cited *Hoyt Bros, Inc v Grand Rapids* with approval.

The "due process" foundation implicit in the *Osius* rule was articulated by this Court 13 years subsequent to *Osius* in *Milford v People's Community Hospital Authority,* 380 Mich 49, 59; 155 NW2d 835 (1968), where this Court stated:

"In the case of *Osius v St Clair Shores* (1956), 344 Mich 693, the Court struck down as unconstitutional an ordinance of the city of St. Clair Shores as a deprivation of substantive due process of law."

[15] See also, *G F Redmond & Co v Michigan Securities Commission,* 222 Mich 1, 5; 192 NW 688 (1923). In that case this Court stated that legislation delegating power to "a commission or administrative board * * * define its purpose and the means of attainment thereof, and do this in language leaving no wide administrative discretion, and no

in support of this dimension of the "standards test", it is clear from judicial decisions in other states[16] and from our own decisions subsequent to *Osius* that this Court implicitly recognized the fact that a flexible, adaptable rule regarding "standards" is necessitated by the exigencies of modern day legislative and administrative government.

For example, as we declared in our recent opinion, *Department of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976):

"[T]he standard should be 'as reasonably precise as the subject matter requires or permits'. *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25; 58 ALR2d 1079 (1956).

"The preciseness of the standard will vary with the complexity and/or the degree to which subject regulated will require constantly changing regulation."

This statement echoed the attitude of this Court in *Ray v Mason County Drain Commissioner,* 393 Mich 294; 224 NW2d 883 (1975), where we noted with respect to the Michigan Environmental Protection Act:

"The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate

discretion at all of a legislative nature". This Court added with respect to this "standards" requirement that:

"The power to carry out a legislative policy enacted into law under the police power *may be delegated to an administrative board under quite general language,* so long as the *exact policy* is clearly made apparent, and the administrative board may carry out in its action the policy declared and delegated, but it cannot assume it has been vested with power beyond expressed legislative delegation, and must ever seek its way in the light shed by the legislative mandate. This marks the line between arbitrary officiousness and the exercise of delegated power to carry out a designated policy under the police power." (Emphasis added.)

[16] See, *e.g.,* 1 Cooper, State Administrative Law, *supra,* pp 62–67 and cases discussed and cited therein.

scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality." 393 Mich 294, 306.

And the extent to which this Court has recognized that the "standards test" must be flexible and adaptable to the exigencies of modern-day legislative and administrative government is evidenced in *Pleasant Ridge v Governor,* 382 Mich 225; 169 NW2d 625 (1969), where the Court, although admitting that the challenged legislation "contains no standards within our constitutional rule" (citing *Osius),* upheld the delegation in question on the grounds that the legislation incorporated by reference a Federal statute which did contain constitutionally sufficient "standards". 382 Mich 225, 243-248.[17]

IV—SUMMARY OF THE PRESENT STATUS OF THE LAW
PERTAINING TO THE QUESTION OF THE DELEGATION
OF LEGISLATIVE POWER TO ADMINISTRATIVE
AGENCIES

As our discussion and analysis in Part III, *supra,* indicates, at present in Michigan the applicable test for determining whether legislation constitutes an unconstitutional delegation of legislative power is the "standards test". The "standards test", as it has come to be recognized in our jurisprudence, includes two essential facets:

(1) legislation which contains a delegation of

---

[17] See, also, *O'Brien v State Highway Commissioner,* 375 Mich 545; 134 NW2d 700 (1965), *Saginaw v Budd,* 381 Mich 173; 160 NW2d 906 (1968), *Highway Commission v Vanderkloot,* 392 Mich 159; 220 NW2d 416 (1974).

power to an administrative agency must contain, either explicitly or by reference (see *Pleasant Ridge v Governor, supra)* "standards prescribed for guidance * * * as reasonably precise as the subject matter requires or permits", *Osius v St Clair Shores, supra,* 698, and

(2) the "standards test" is rooted in two constitutional principles, the constitutional doctrine of "separation of powers" and the due process clause of our Constitution.[18] With respect to the separation of powers, the Legislature does not "delegate" or "abdicate" its power to an administrative agency if the challenged legislation contains "standards * * * as reasonably precise as the subject matter requires or permits". See *People v Soule, supra; Osius v St Clair Shores, supra;* see also *Department of Natural Resources v Seaman, supra.* With respect to due process, the Legislature does not delegate power to an administrative agency in such a manner that the legislation "becomes an open door" to favoritism, discrimination, and arbitrary, uncontrolled discretion on the part of administrative agencies if the challenged legislation contains "standards * * * as reasonably precise as the subject matter requires or permits". *Osius v St Clair Shores, supra,* see discussion, part III, *supra.*

## V—The Rule for Whether Challenged Legislation Constitutes a Constitutional Delegation of Power to an Administrative Agency

From our analysis and summary of the question of whether legislation constitutes a constitutional delegation of power to an administrative agency

---

[18] Const 1963, art 1, § 17.

and its present judicial expression in the so-called "standards test", we make the following observations.

## A. The "Delegation Doctrine" and the Constitutional "Separation of Powers"

First, we believe the constitutional "separation of powers" foundation of the "delegation doctrine" is essentially valid. At a minimum, in order to preserve the constitutional "separation of powers", legislation in which power is delegated to an administrative agency must contain language, expressive of the legislative will, that defines the area within which an agency is to exercise its power and authority. Without such language, there would be no "constitutional accountability", *i.e.,* there would not exist an effective measure by which agency compatability with the legislative will might be ascertained. Or, to phrase this argument in different constitutional language, without such language, there would not exist an effective measure by which the Legislature, the courts, and the public might "check" agency action.

We believe the "standards test", as it has come to be expressed in our jurisprudence, satisfies the constitutional principle of the "separation of powers". If legislation contains, either expressly or by incorporation, standards "reasonably as precise as the subject matter requires or permits", the Legislature, the courts, and the public may, if necessary, constitutionally "check" the use of delegated power by an agency. Therefore, we affirm the present expression of the "standards test" as a means of preserving the constitutional principle of the "separation of powers". Accordingly, in the face of a challenge to whether legislation constitutes a constitutional delegation of power to an

administrative agency, a court is to determine whether the legislation expressly contains or contains by reference "standards * * * as reasonably precise as the subject matter requires or permits".

We also observe, as a matter of analysis, that when "standards * * * as reasonably precise as the subject matter requires or permits" exist, the principle that the Legislature may not delegate or abdicate "law-making" or "legislative" power but only "administrative" power becomes merely a principle of description or convenience, not substance.

No one would argue the obvious fact that the legislative delegation of rule-making power to administrative agencies is a crucial dimension of our system of government. In terms of constitutional principle, the relevant questions become: does an administrative agency, in promulgating rules pursuant to delegated rule-making power, an action which, effectively, has every character of law, act unconstitutionally? Does an agency in such an instance usurp the "legislative" law-making function? Does the agency in such an instance "legislate"?

We believe not.

We recognize that agency "rule-making" certainly resembles "legislating" in the sense that "rule-making" creates new rules of conduct. Considered from this point of view, "rule-making" could be referred to as a "legislative-like" function, a "quasi-legislative" function, or, in a loose sense, "legislation". However, the making of rules by an administrative agency pursuant to legislatively delegated rule-making power differs from "legislation" or "law-making" in two essential aspects. First, the *source of the power* to make the rule *is in the Legislature.* Second, the concept of "legislation", in its essential sense, is the power to speak on any subject *without any specified limitations.*

However, constitutionally, "standards * * * as reasonably precise as the subject matter requires or permits" do specify limitations on agency rule-making. Thus, when such standards exist, agency rule-making is not an unconstitutional action because the Legislature has (1) authorized and (2) limited such action. Also, agency rule-making is not a usurpation of the "legislative" law-making function because the Legislature has (1) directed the agency to so act and (2) limited the scope within which it may act. Finally, agency rule-making is not "legislating" in the essential sense of the word, because the agency is acting within specified limitations ("standards") established by the Legislature and is not acting in accordance with its *own* will.

In sum, when properly prescribed "standards" exist, the Legislature has not abdicated its law-making or "legislative" power because the agency to which the power is delegated is limited in its action by the Legislature's prescribed will; it cannot follow its own uncircumscribed will. Thus, if the word "legislating" or "law-making" is used with respect to administrative rule-making (as it has been by some commentators),[19] it must be understood that in *terms of the constitutional separation of powers, such a word is being used in a general, descriptive sense and not in a constitutionally usurpative sense.

## B. The "Delegation Doctrine" and Due Process

Second, we also believe the "due process" constitutional foundation of the "delegation doctrine" is essentially valid.

---

[19] See, *e.g.,* 1 Cooper, State Administrative Law, *supra,* p 47; Davis, Administrative Law Treatise, 1970 Supplement, *supra,* p 40; see also, Justice LEVIN's dissent in *People v Fields,* 391 Mich 206, 227; 216 NW2d 51 (1974).

*However, we do not believe the "standards test"*
*as it has come to be expressed in our jurisprudence*
*by itself satisfies the constitutional principle of due*
*process.* This conclusion is based on the fact that
the "standards test" as presently expressed, *i.e.,*
"standards" need be only "as reasonable as the
subject matter requires or permits", implies the
judicial recognition that in some instances it is not
possible, nor even desirable, to require legislative
standards of a carefully detailed nature. See dis-
cussion, part III and part IV, *supra.*

This judicial recognition, inherent in the present
"standards test", exposes a profound legal para-
dox: the broader, the more "flexible" the legisla-
tive "standards" permitted in given legislation (for
valid reasons), the less the people are protected
from potential discretionary abuse at the hands of
administrative officials. See 1 Cooper, State Ad-
ministrative Law, *supra,* p 61.

Thus, the "standards test", in its present form,
is not in every case an effective means of assuring
"due process" protection.

Accordingly, in order to best effectuate constitu-
tional due process with respect to the delegation of
legislative power to administrative agencies, we
choose to focus not on legislative "standards" (in
the sense developed by our Court) but rather we
choose to focus on the safeguards, *including "stan-*
*dards", which are afforded.*[20] We add, as a corollary

---

[20] This emphasis on the "safeguards, including 'standards' which
the legislation affords" in order to best effectuate the due process
foundation of the "delegation doctrine" echoes the judicial approach
argued by Professor Davis:

"The non-delegation doctrine can and should be altered to turn it
into an effective and useful judicial tool. Its purpose should no longer
be either to prevent delegation of legislative power or to require
meaningful statutory standards; its purpose should be the much
deeper one of protecting against unnecessary and uncontrolled discre-
tionary power. *The focus should no longer be exclusively on stan-*
*dards; it should be on the totality of protections against arbitrariness,*

to this rule, that when the "standards" afforded provide little or no actual due process protection, a court should, in balance, require that a sufficient totality of safeguards exists, thereby assuring that the public will be protected against potential abuse of discretion at the hands of administrative officials.

*In summary,* we rule that a delegation of legislative power to an administrative agency is constitutionally valid when:

(1) for purposes of satisfying the constitutional principle of the "separation of powers," the legislation in which power is delegated to an administrative agency expressly or by reference includes "standards * * * as reasonably precise as the subject matter" of the legislation "requires or permits"; and

(2) for purposes of satisfying the Due Process Clause of our Constitution, safeguards, including "standards", exist, thereby assuring that the public will be protected against potential abuse of discretion at the hands of administrative officials; and, if the "standards" afforded provide little or no actual due process protection, a court should, in balance, determine whether a sufficient totality of safeguards exists.[21]

---

*including both safeguards and standards. The key should no longer be statutory words; it should be the protections the administrators in fact provide, irrespective of what the statutes say or fail to say."* Davis, Administrative Law Treatise, 1970 Supplement, pp 40–41.

See also Justice LEVIN's dissenting opinion in *People v Fields, supra,* 231–232.

We wish to emphasize that this approach best effectuates the *due process* foundation of the delegation doctrine, *i.e.,* the "standards test" as it has evolved in our jurisprudence no longer in itself assures *due process* protection. However, Professor Davis, in his commentary, does not consider the "standards test" in terms of the "separation of powers" constitutional foundation of the "delegation doctrine". As we have carefully ruled, the "standards test" *is* an effective means for assuring that the constitutional "separation of powers" is maintained vis-à-vis a particular delegation of power to an administrative agency.

[21] We note that our discussion has been limited to the "delegation

## VI—WHETHER THE CHALLENGED DELEGATION OF "LEGISLATIVE" POWER IN THIS CASE IS CONSTITUTIONAL

We now address the issues before us.

The first and threshold issue is whether the Legislature, in conferring authority upon the DNR and the Natural Resources Commission to promulgate rules and regulations pursuant to §§ 3 and 3a of 1921 PA 17; MCLA 299.3, 299.3a; MSA 13.3, 13.4, unconstitutionally delegated its legislative power.

As we ruled *supra,* a delegation of legislative power to an administrative agency is constitutionally valid when:

(1) for purposes of satisfying the constitutional principle of the "separation of powers", the legislation in which power is delegated to an administrative agency expressly or by reference includes "standards * * * as reasonably precise as the subject matter" of the legislation "requires or permits"; and

(2) for purposes of satisfying the Due Process

---

doctrine" as it pertains to legislative delegation of its lawmaking power to an administrative agency. This, of course, is not the only dimension of the "delegation doctrine". The constitutionality of legislative "delegation" has also risen in the context of legislative delegation of "judicial" power to administrative agencies; legislative delegation of lawmaking and/or judicial power to private groups or persons, see, *e.g., Dearborn Fire Fighters Union Local No 412, IAFF v Dearborn,* 394 Mich 229; 231 NW2d 226 (1975); and legislative delegation of "non-judicial" power to the judiciary, see, *e.g., Local 170, Transport Workers Union of America v Genesee Circuit Judge,* 322 Mich 332; 34 NW2d 71 (1948). For the most part, the "delegation doctrine" as it pertains to these kinds of delegations, has developed along similar analytical lines to the "delegation of legislative power to administrative agencies". *In this case, however, we are not deciding the constitutional stance we wish to take toward these delegations.* However, if the constitutionality of these "delegations" were to be challenged, it is suggested that a court adopt the general method of analysis we have adopted in this case, *i.e.,* a court should analyze the constitutional foundations involved in the particular delegation and seek the best, most realistic means of effectuating them.

Clause of our Constitution, safeguards, including "standards," exist, thereby assuring that the public will be protected against potential abuse of discretion at the hands of administrative officials; and, if the "standards" afforded provide little or no actual due process protection, a court should, in balance, determine whether a sufficient totality of safeguards exists.

Accordingly, in terms of this case, we first ask, for purposes of satisfying the constitutional principle of the "separation of powers", whether the challenged delegation, as contained in §§ 3 and 3a of the act, expressly or by reference, includes standards as reasonably precise as the subject matter of the legislation, agency protection and conservation of natural resources, requires or permits.

Our answer to this question is yes.

Section 3 of the act provides:

"The department of conservation shall protect and conserve the natural resources of the state of Michigan; provide and develop facilities for outdoor recreation; prevent the destruction of timber and other forest growth by fire or otherwise; promote the reforesting of forest lands belonging to the state; prevent and guard against the pollution of lakes and streams within the state, and enforce all laws provided for that purpose with all authority granted by law, and foster and encourage the protecting and propagation of game and fish." MCLA 299.3; MSA 13.3.

Section 3a provides:

"The commission of conservation shall make such rules for protection of the lands and property under its control against wrongful use or occupancy as will insure the carrying out of the intent of this act to protect the same from depredations and to preserve such lands

and property from molestation, spoilation *[sic]*, destruction or any other improper use or occupancy." MCLA 299.3a; MSA 13.4.

As is apparent, § 3 defines the authority of the DNR in its most general sense: The Department of Conservation (now the DNR) "shall protect and conserve the natural resources of the State of Michigan". The Legislature then specifies those "natural resources" it desires the agency to "protect and conserve":

"[P]rovide and develop facilities for outdoor recreation; prevent the destruction of timber and other forest growth by fire or otherwise; promote the reforesting of forest lands belonging to the state; prevent and guard against the pollution of lakes and streams within the state, and enforce all laws provided for that purpose with all authority granted by law, and foster and encourage the protecting and propagation of game and fish." MCLA 299.3; MSA 13.3.

Do these sections, read together, provide standards as reasonably precise as the subject matter of the legislation, the protection and conservation of our natural resources, requires or permits? We believe they do. In reaching this conclusion, we are mindful of the fact that 1921 PA 17, as amended, is an act which deals with the preservation and regulation of the quality of our natural resources. As we declared in *DNR v Seaman, supra:*

"The preciseness of the standard will vary with the complexity and/or the degree to which subject regulated will require constantly changing regulation. *The 'various' and 'varying' detail associated with managing the natural resources has led to recognition by the courts that it is impractical for the Legislature to provide specific regulations and that this function must be performed by the designated administrative officials.*

*People v Soule,* 238 Mich 130, 140; 213 NW 195 (1927). See *United States v Grimaud,* 220 US 506; 31 S Ct 480; 55 L Ed 563 (1910)." (Footnote omitted, emphasis added.) 396 Mich 299, 309.

And, although in the words of this Court in *Ray v Mason County Drain Commissioner, supra,* "the language of the statute paints the standard for environmental quality with a rather broad stroke of the brush, the language used is neither illusive nor vague". 393 Mich 294, 307, fn 10. As with the language in our Environmental Protection Act, "pollution", "impairment", and "destruction",[22] the language in 1921 PA 17, as amended, §§ 3 and 3a, "prevent and guard against the pollution of lakes and streams" and "molestation", "spoilation", "destruction", and "improper use or occupancy" acquires its meaning from our state's developing and evolving common law of environmental quality, 393 Mich 294, fn 10, 307.

For these reasons, §§ 3 and 3a of the act, read together, satisfy the constitutional principle of the "separation of powers" in providing standards as reasonably precise as the subject matter of the legislation requires or permits.

Next, in accord with our rule enunciated *supra,* we ask, in terms of this case, whether safeguards, including "standards", exist, thereby assuring that the public will be protected against potential abuse of discretion at the hands of administrative officials. Additionally, we must consider whether the "standards" afforded provide actual due process protection in themselves. If not, we must determine, in balance, whether a sufficient totality of safeguards exists.

As we have discussed, the "standards" afforded

---

[22] See MCLA 691.1202(1); MSA 14.528(202)(1). See, also, 393 Mich 294, 305.

by the challenged legislation, contained in §§ 3 and 3a of the act, are, necessarily and properly, painted "with a rather broad stroke of the brush". However, the clear result of this is that these "standards" provide, in themselves, insufficient due process protection. Therefore, we must ask whether, in balance, a sufficient totality of safeguards exists.

Our answer to this question is yes.

First, we note the fact that the Administrative Procedures Act (the APA) is, by legislative fiat, in full effect with respect to any rule-making in which the DNR engages.[23] The APA requires that an agency adhere to detailed, extensive procedural requirements when engaged in rule-making pursuant to statutory delegation.[24] Without doubt, these procedural requirements provide extensive due process safeguards to those persons affected by the agency's rule-making.

Second, we note that 1921 PA 17 includes language reflecting the agency's high degree of statutorily-based political accountability. 1921 PA 17, MCLA 299.1; MSA 13.1, as amended, provides in pertinent part:

"The general administration of said powers and duties shall be vested in a commission of conservation which shall be composed of 7 members appointed by the governor, subject to confirmation by the senate. The members of said commission shall be selected with special reference to their training and experience along the line of 1 or more of the principal lines of activities

[23] See, 1969 PA 306; Administrative Procedures Act of 1969; MCLA 24.201 *et seq.;* MSA 3.560(101) *et seq.*

[24] See, especially, Chapter 3 of the APA, "Procedures for Processing and Publishing Rules", §§ 31 to 64 of the act; MCLA 24.231–24.264; MSA 3.560(131)–3.560(164). See also Cramton & Holmes, eds, The New Michigan Administrative Procedures Course Handbook (Ann Arbor, Institute of Continuing Legal Education, 1970), pp 63–93.

vested in the department of conservation and their ability and fitness to deal therewith: Provided, That 2 of these members shall reside in the upper peninsula. The term of office of each member of the commission shall be six years: Provided, That of those first appointed 3 shall be appointed for 2 years, 2 for 4 years and 2 for 6 years."

The agency's high degree of proximity to the elective process (appointment by the Governor and confirmation by the Senate) is, in our opinion, an additional, substantial factor assuring that the public is not left unprotected from uncontrolled, arbitrary power in the hands of remote administrative officials. We believe this factor, *plus* the safeguards inherent in the APA, provide constitutionally sufficient protection to the people as required by due process.

Therefore, §§ 3 and 3a of 1921 PA 17, MCLA 299.3, 299.3a; MSA 13.3, 13.4, satisfy both constitutional requisites essential to a "delegation of legislative power to an administrative agency". Accordingly, we hold that the delegation of rule-making power to the DNR and the Natural Resources Commission pursuant to this statute is a constitutionally valid delegation of "legislative" power.

## VII—WHETHER THE "RIVER USE RULES" PROMULGATED BY THE DNR ARE INVALID BECAUSE THEY EXCEED THE SCOPE OF AUTHORITY DELEGATED UNDER THE ACT

The second issue before us is whether the "river use rules" promulgated by the DNR are invalid because the agency exceeded the scope of its delegated authority under 1921 PA 17; MCLA 299.1 *et seq.;* MSA 13.1 *et seq.,* as amended.

In order to resolve this question, we must, of

course, look to the "standards" found in §§ 3 and
3a of the act, read together, *i.e.,* the language of
the act, expressive of the legislative will, that
defines the area within which an agency is to
exercise its power and authority. See discussion,
part V-A, *supra.*

As discussed, §§ 3 and 3a of the act authorize
the Natural Resources Commission, through the
DNR, to "make rules" which "prevent and guard
against pollution of lakes and streams" and which
preserve these "lakes and streams" from "molesta-
tion, spoilation, destruction, or any other improper
use or occupancy". The issue can, therefore, be
rephrased as follows: do the "river use rules"
prevent and guard against pollution of lakes and
streams and preserve them from "molestation,
spoilation, destruction, or any other improper use
or occupancy"?

In order to properly resolve this issue, this Court
must be certain that on the record, (1) a state of
facts exists that justifies regulation of the use of
the rivers in question; and (2) that the regulations
adopted are reasonably calculated to "prevent and
guard against pollution of lakes and streams" and
preserve them from "molestation, spoilation, de-
struction, or any improper use or occupancy".

However, the present state of the record does
not allow us, with fairness to the trial judge and
the parties, to adequately answer these questions.
This is because the parties and trial judge in this
case believed that the determinant issues could be
decided without reference to the surrounding facts.
The stipulation on which the case was tried read
pertinently as follows:

"It is further stipulated and agreed that for the
purpose, and only for the purpose, of the declaratory
consideration, it is specified that there was and is

conduct, conflict of use, pollution and other injury to the natural resources on the streams in question sufficient to justify concern by the Department of Natural Resources and some form of regulation of river use.

"That as to those plaintiffs doing business in the controlled river stretches, it is agreed for the purposes of this case that there would be a diminution of profit if the permit system of use is instituted.

"This stipulation is to insure the non-introduction of factual matter in a case where, by stipulation, the legal issues only are to be argued.

"It is also further stipulated and agreed:

"1. That the various drafts of the proposed 'River Use Rules' with dates of publication, the transcript of testimony taken at the three public hearings, the transcript of commission meetings when rules were considered, the chronological schedule of events, the technical reports and the report to the joint committee all be submitted and that these documents be used by the court in its deliberation and judgment."

The trial court on "motion to amend findings of fact and to make additional findings" made it clear in its subsequent order that "all of the facts presented were presented by a stipulated set of facts and the court made no finding of facts". See, also, part I, *supra.*

It is noted that the stipulation stated that "the transcript of testimony taken at the three public hearings, the transcript of commission meetings when rules were considered, the chronological schedule of events, the technical reports and the report to the joint committee all be submitted and that those documents be used by the court in its deliberation and judgment". However, it does not appear that the trial judge considered these materials and no real presentation of these materials, other than the chronological schedule of events, has been made in brief or argument before this Court nor included in the record. As a conse-

quence, it is not possible for this Court to examine
these materials on its own and make a proper
determination of the issue before us.

One final observation related to the stipulation;
the stipulation "that there was and is conduct,
conflict of use, pollution and other injury to the
natural resources on the streams in question suffi-
cient to justify concern by the Department of
Natural Resources and *some form of regulation* of
river use" (emphasis added) certainly is not deter-
minative one way or the other as to the validity of
the *particular form* of regulation adopted by the
DNR.

We therefore remand to the trial court to con-
sider the issue of whether the "river use rules" are
invalid because the DNR exceeded the scope of its
statutory authority. In resolving this issue, the
trial court should make the following preliminary
findings:

1) Whether there is in fact and to what extent
there is existent or threatened "pollution", "moles-
tation", "spoilation", or "destruction" with respect
to each of the rivers sought to be regulated by the
proposed rules;

2) assuming there is existent or threatened "pol-
lution", "molestation", "spoilation", or "destruc-
tion" with respect to each river, whether the
"river use rules" are, in fact, related to the pre-
vention of these conditions. With respect to this
finding, the court should question:

a) whether the passage of watercraft relates to
the "pollution", "molestation", "spoilation", or
"destruction" of each of the rivers sought to be
regulated by the proposed rules;

b) whether the numbers of and kind of water-
craft allowed under the "river use rules" relates to
the prevention of "pollution", "molestation",

"spoilation", or "destruction" of each of the rivers sought to be regulated by the rules;

c) whether the two "seasonal time zones", one which restricts watercraft use, the other permitting it, are related to the density of watercraft use during these prescribed times.

We add that the above referred-to "transcript of testimony taken at the three public hearings, the transcript of the commission meetings when rules were considered, the chronological schedule of events, the technical reports and the report to the joint committee" should be entered into the record to aid the trial court in making the above findings.

## VIII—CONCLUSION

We hold that the challenged delegation of legislative power in this case is constitutional and therefore reverse the Court of Appeals with respect to this first issue.

As to the second issue, whether the "river use rules" promulgated by the DNR are invalid because they exceed the scope of authority delegated, we remand to the trial court for proceedings not inconsistent with this opinion. We also remand, without prejudice, with respect to the other issues to which the parties stipulated, but which were not considered at trial.[25]

No costs; a public question.

LEVIN and FITZGERALD, JJ., concurred with WILLIAMS, J.

---

[25] We order this remand mindful of the fact that the only two issues before us on appeal are (1) whether §§ 3 and 3a of 1921 PA 17, as amended, constitute a constitutional delegation of power to the Natural Resources Commission and the Department of Natural Resources; and (2) whether the "river use rules" promulgated by the Department of Natural Resources are within the scope of authority or power constitutionally delegated to the agency.

As we discussed in part I, *supra,* although a number of issues were

Ryan, J. *(concurring).* I agree that the Legislature did not unconstitutionally delegate its lawmaking power when it conferred limited authority on the Natural Resources Commission to promulgate rules in order to fulfill its statutory duties and responsibilities under MCLA 299.1 *et seq.;* MSA 13.1 *et seq.* I write separately because I do not fully agree with Justice Williams' analysis.

Justice Williams finds that the delegation doctrine is grounded not only in the constitutional separation of powers but also in constitutional due process. I do not agree with the latter premise.

Any legislative grant of authority to an agency may be challenged under the "standards test" to determine whether the Legislature has attempted to vest its lawmaking power in that agency contrary to the constitutional separation of powers. When a grant of authority has been determined to be lawful, the authorizing legislation may be tested further to ascertain whether adequate procedural safeguards have been provided to assure the protection of the due process rights of any party affected by the agency's exercise of its authority. These are separate and distinct constitutional inquiries.

---

raised in plaintiffs' complaint, the trial court only decided the question of whether the "river use rules" were within the scope of authority granted the Natural Resources Commission and Department of Natural Resources pursuant to 1921 PA 17. Then, on appeal, the Court of Appeals recognized that resolution of this issue is premised on the resolution of a more basic issue, namely, whether 1921 PA 17 constitutes a constitutional delegation of power. Accordingly, on appeal to this Court, we have before us only these two issues.

We note, in remanding, that one of the issues raised below, the substantive due process question of an unconstitutional "taking of business opportunities and properties" may require the parties to establish with respect to the particularities of the "river use rules" as detailed a record as, or perhaps a more detailed record than, the record we have deemed necessary for the resolution of the second issue before us on this appeal.

I have always understood the delegation doctrine to be grounded solely in the constitutional provision for the separation of the powers of government into the legislative, executive and judicial branches. Const 1963, art 3, § 2.[1] This provision expressly prohibits the exercise by one branch of government of the powers properly belonging to another branch. Thus, our Constitution prohibits the Legislature from delegating its lawmaking powers to an administrative agency in the executive branch.

However, this Court has recognized that the Legislature can constitutionally authorize an administrative agency to exercise certain powers when fulfilling its legislatively created duties and responsibilities. See, for example, *Michigan C R Co v Michigan Railroad Comm,* 160 Mich 355, 361–368; 125 NW 549 (1910); *G F Redmond & Co v Michigan Securities Comm,* 222 Mich 1; 192 NW 688 (1923), and *People v Soule,* 238 Mich 130, 138–139; 213 NW 195 (1927). The judicial test for determining whether the Legislature has acted properly in authorizing such agency action has emerged as the so-called "standards test". This test requires the Legislature to prescribe "standards * * * as reasonably precise as the subject matter requires or permits", *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956), when conferring regulatory and rule-making authority on an administrative agency. When so constrained by legislative fiat, an agency may properly promulgate rules, and it is not unconstitutionally exercising lawmaking powers when it does so.

---

[1] "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2.

Although this "standards" test has borne the brunt of vigorous criticism,[2] it has retained its essential validity and is dispositive of the first issue in this appeal.

The Legislature vested the general administration of MCLA 299.1 *et seq.;* MSA 13.1 *et seq.,* in the Natural Resources Commission and conferred power on the commission both to promulgate rules to govern the administration of that act and to promulgate rules concerning the use and occupancy of the lands and property under its control. MCLA 299.2; MSA 13.2. The standards guiding the commission in promulgating these rules include, inter alia, the duties imposed on the Department of Natural Resources, under MCLA 299.3; MSA 13.3, of "protect[ing] and conserv[ing] the natural resources of the state"; "prevent[ing] and guard-[ing] against the pollution of lakes and streams within the state"; and "foster[ing] and encourag-[ing] the protecting and propogation of game and fish". Additional standards are found in the legislative mandate given the commission to make those "rules for protection of the lands and property under its control against wrongful use or occupancy as will insure the carrying out of the intent of this act to protect the same from depredations and to preserve such lands and property from molestation, spoilation, destruction or any other improper use or occupancy". MCLA 299.3a; MSA 13.4. The intent of this act as expressed in the first line of its title, includes "provid[ing] for the protection and conservation of the natural resources of the state".

The protection and conservation of our natural resources requires a high level of expertise. The

---

[2] 1 Davis, Administrative Law Treatise, ch 2, and Davis, Administrative Law Treatise, 1970 Supplement, ch 2, and Cum Supp, 1977, ch 2.

"various" and "varying" detail associated with managing the natural resources has led us to recognize that it is normally impractical for the Legislature to establish rules and regulations of requisite specificity and that this function must be performed by the designated administrative officials. *Dep't of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976).

The standards enunciated by the Legislature to govern the Natural Resources Commission in the exercise of its rule-making authority are "as reasonably precise as the subject matter requires or permits," *Osius, supra.* I agree that the Legislature did not unconstitutionally delegate its lawmaking power to the Commission in violation of the separation of powers when this legislation was enacted. No further analysis is necessary to determine there has been legislative compliance with the delegation doctrine.

I share Justice WILLIAMS' concern with insuring that constitutional due process is afforded to any party affected by an agency's action. Const 1963, art 1, § 17. However, I do not agree with his analysis of due process as a second facet of the "standards test" for the purpose of determining compliance with the delegation doctrine.

Justice WILLIAMS cites cases which he finds stand for the proposition, or "hint" at the proposition, that a legislative body has unconstitutionally delegated its lawmaking power, on due process grounds, when it authorizes an agency or public official to act, but fails to articulate standards to insure that the agency or official does not act in an arbitrary or capricious manner.[3] In my opinion,

[3] *Devereaux v Genesee Twp Board,* 211 Mich 38; 177 NW 967 (1920); *G F Redmond & Co v Mich Securities Commission,* 222 Mich 1; 192 NW 688 (1923); *Harrigan & Reid Co v Burton,* 224 Mich 564; 195 NW 60 (1923); *Postal v Village of Grosse Pointe,* 239 Mich 286; 214

this interpretation unnecessarily confuses the delegation issue with the due process issue. In each of the cases cited by him, the delegation question could have been answered by a determination whether there existed standards "as reasonably precise as the subject matter requires or permits", *Osius, supra,* to govern the exercise of the legislatively created powers. Judicial inquiry into the delegation doctrine should be concerned solely with this question.

Inquiry into the due process question involves a separate and distinct issue and must focus on the procedural safeguards provided to govern the exercise of the agency's authorized powers. Consequently, there is no need to address the due process issue until it has first been established that the Legislature has not violated the delegation doctrine, but has properly authorized an agency to act under "standards * * * as reasonably precise as the subject matter requires or permits". That having been done, the due process inquiry should then focus on the actual, or potential for, abuse of discretion in the agency's exercise of its power.

In evaluating whether there is potential for abuse in the agency's exercise of its discretion, a court may look to a number of sources including the legislative declaration of policy made in the act which authorizes the agency actions; the procedural safeguards that govern the agency in the exercise of its powers; the provisions for legislative supervision of the agency's actions; and the provisions for judicial review.[4] Of them all, the procedural safeguards will provide the greatest assurance of due process protection. These may be

NW 148 (1927); *Hoyt Bros, Inc v Grand Rapids,* 260 Mich 447; 245 NW 509 (1932).

[4] 1 Davis, Administrative Law Treatise, ch 2, § 2.08.

found in the very legislation which authorizes the agency action; in other legislation which is incorporated by reference into the authorizing legislation, *Pleasant Ridge v Governor,* 382 Mich 225, 243; 169 NW2d 625 (1969); in the procedures defined in the Administrative Procedures Act, MCLA 24.201 *et seq.;* MSA 3.560(101) *et seq.,* or in any combination of the foregoing.

The legislation presently under consideration requires the Natural Resources Commission to follow the provisions of the Administrative Procedures Act when promulgating any rules. MCLA 299.3a; MSA 13.4. The procedures there prescribed are sufficient to insure the proper protection of the due process rights of any person who might be affected by the agency's action, if the procedures are followed by the agency.

I agree with Justice WILLIAMS that the record before us on this appeal is inadequate to determine whether the DNR was acting within the scope of its properly delegated authority when it adopted these river use rules and whether, in fact, it afforded all affected parties sufficient due process safeguards when it exercised that authority. Therefore, I concur in the result reached by him.

KAVANAGH, C.J., and COLEMAN, J., concurred with RYAN, J.

BLAIR MOODY, JR., J., took no part in the decision of this case.