DUKESHERER FARMS, INC v DIRECTOR OF THE DEPARTMENT
OF AGRICULTURE (AFTER REMAND)

Docket No. 59321. Argued January 6, 1978 (Calendar No. 14).—Decided January 9, 1979.

> Dukesherer Farms, Inc., brought a class action on behalf of all cherry producers in Michigan subject to assessment under the Cherry Promotion and Development Program seeking a permanent injunction against actions of the Director of the Department of Agriculture and the Michigan Cherry Promotion and Development Committee under the Agricultural Commodities Marketing Act and for a declaratory judgment on the constitutionality of the act and of the program which the defendants developed under the act to promote the marketing of Michigan cherries. The plaintiff argues that the "assessments" authorized by the marketing act constitute taxes which are subject to constitutional limitations and that the marketing act unconstitutionally delegates general legislative power to producers of agricultural commodities. The plaintiff also asks for a return of assessments previously collected and an award of attorney fees. The Michigan Association of Cherry Producers intervened as a defendant. The Berrien Circuit Court, William S. White, J., upon remand from the Supreme Court, 393 Mich 758 (1974), granted summary judgment for the defendants. The Court of Appeals, R. B. Burns, P.J., and M. J. Kelly and S. S. Hughes, JJ., affirmed (Docket No. 26699). Plaintiff appeals. *Held:*
>
> The levy is an assessment, not a tax, and there is no uncon-

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 71 Am Jur 2d, State and Local Taxation §§ 2, 3.
[3, 5] 70 Am Jur 2d, Special or Local Assessments § 1.
[4, 5] 70 Am Jur 2d, Special or Local Assessments § 20.
[6] 70 Am Jur 2d, Special or Local Assessments §§ 4-8.
[7, 14] 16 Am Jur 2d, Constitutional Law §§ 248, 258.
[8, 9, 11-13] 1 Am Jur 2d, Administrative Law §§ 110, 111, 113, 116-118.
  2 Am Jur 2d, Administrative Law §§ 191, 192.
[10] 1 Am Jur 2d, Administrative Law § 148.
  16 Am Jur 2d, Constitutional Law § 559.
[15] 16 Am Jur 2d, Constitutional Law § 249.

stitutional delegation of the taxing power of the state. The statute does not improperly delegate legislative powers to private persons.

Justice Williams, with Justices Fitzgerald and Moody, wrote:

1. Taxes are exactions, or involuntary contributions of money which are sanctioned by law and enforceable by the courts, which are imposed primarily for public rather than private purposes. Revenue from taxes inures to the benefit of all, as opposed to exactions from a few for benefits that will inure to the persons or groups assessed.

2. The Agricultural Commodities Marketing Act specifically states that funding is to come from an assessment of each producer of the commodity who is directly affected by the marketing program, and that the collected assessments are not state funds and are to be disbursed solely for necessary expenses incurred by each marketing program. Thus, the scheme of the act is consistent with the imposition of an assessment rather than a tax. It is structured to apply to and for the benefit of producers of specific commodities.

3. The fact that general benefits, such as stimulation of the state's economy or institution of quality standards and inspection systems, are by-products of the marketing act does not deny that the benefits inure primarily to the producers. The Legislature has made a rational decision that assessment, as opposed to taxation, is the reasonable means of effectuating its purpose. Examination of the underlying circumstances here does not dictate a finding that the Legislature erred. The instant case is analogous to ones which are commonly deemed the proper subjects for assessment such as street improvements, drains, and sewers. The persons who receive the tangible and most immediate benefits are the ones obligated to pay. The Agricultural Commodities Marketing Act gives the commodity committees the power to "assess" for necessary expenses incident to effecting its regulatory and promotional goals and not the power to tax for general revenue. There is no unconstitutional delegation of the taxing power of the state.

4. The requirement of a referendum is not without precedent and need not constitute improper delegation of legislative authority. It can simply be a measured decision by the Legislature to allow those most intimately affected to decide whether forming a marketing program is a proper manner in which to effectuate their business goals. As long as this is done under sufficient standards and safeguards provided by the Legislature, there is no improper delegation of authority.

5. The standards for determining whether there has been a

proper delegation of authority are: First, the act in question must be read as a whole; the provision in question should not be isolated but must be construed with reference to the entire act. Second, the standard should be "as reasonably precise as the subject matter requires or permits". The preciseness of the standard will vary with the complexity or the degree to which subject regulated will require constantly changing regulation. Third, if possible the statute must be construed in such a way as to render it valid, not invalid, as conferring administrative, not legislative, power and as vesting discretionary, not arbitrary, authority.

6. The Agricultural Commodities Marketing Act, when read as a whole, clearly and sufficiently defines standards to guide growers, the Director of the Department of Agriculture and the commodity committee in the formulation and operation of a program, and provides sufficient safeguards for all involved. While the ability to propose a program or amendments to an existing program rests solely with a given percentage of affected growers, there can be no program unless it contains statutory requirements, is processed as required by statute, and is approved by the director. The director may require a report of all names and addresses of producers from handlers or processers. Further, a public hearing with notice must be held to receive the views of the producers and within 45 days the director must issue a complete report with all findings and recommendations. If the director approves the program, it is put to a referendum. If a program is approved by referendum, the continuing duties of the director are set forth in the act as well as the types of provisions that may be covered by a marketing agreement, and the duties of a commodity committee. All proposed programs must include specified terms including the maximum assessment rate, and monies can be disbursed only for necessary expenses. There is also provision for refund of any money not so expended. At all stages, the Administrative Procedures Act applies. The standards of the Agricultural Commodities Marketing Act and the Administrative Procedures Act insure that any marketing program under the marketing act will not be the result of an abdication of authority by the Legislature, and also provide sufficient safeguards to comply with the requirements of constitutional due process.

7. It is true that the marketing act utilizes general terms and not specifics. The subject matter, however, demands such a treatment. When viewed in light of the wide range of purposes for which producers may benefit by application of the market-

ing act, it is clear that it contains as much specificity as is practical. The Legislature has effectuated its purpose with standards as reasonably precise as the subject matter permits.

8. The legislatively provided guidelines and standards which are necessary to minimize the opportunity for abuse of discretion as well as to adequately protect the interests of those affected by the regulations are present in the Agricultural Commodities Marketing Act. Specific provisions of the act demonstrate that the producers must actively participate in all stages of development and effectuation of a marketing program. Further, a system of checks and balances is provided among producers, the Director of the Department of Agriculture and members of the commodity committee to insure not only compliance with the act, but implementation of an objective marketing program that will meet the needs of those to whom it applies. The Agricultural Commodities Marketing Act and the program developed under it are, therefore, constitutional.

Justice Ryan, with Justice Kavanagh and Justice Coleman, concurred with Justice Williams that the levy challenged is an assessment, not a tax, and thus is not an unconstitutional delegation of the taxing power of the state. He also agreed that there is not an unconstitutional delegation of legislative authority to private persons, but did not agree with Justice Williams' analysis: the judicial test for determining whether the Legislature has acted properly, within constitutional constraints, when it authorizes an agency to exercise certain powers, is whether it has prescribed standards as reasonably precise as the subject matter requires or permits. The participation of private persons in the exercise of those powers does not alter the validity of the test; it merely adds another consideration. An analysis of the statute leads to the conclusion that it does comply with the requisite standards test, because, while the standards in the act speak in broad terms, they are as reasonably precise as the subject matter requires or permits. The provisions for a petition by agricultural producers for adoption of a program, and for referendums for actual adoption or termination of a program, reflect a measured decision by the Legislature to allow those most intimately affected by a marketing program to determine whether that program is the method they choose to effectuate their business goals. Such a referendum does not constitute an improper delegation of legislative power.

Justice Levin, concurring in the disposition, agreed that the Agricultural Commodities Marketing Act is not unconstitutional on its face and that the cherry producers' marketing

program is not per se invalid. However, he wrote separately to state that the program might, nevertheless, be unconstitutional as applied to the plaintiff or some other cherry producer. Although a delegation of law-making power is not necessarily invalid because private persons have a voice in its exercise, the power may be exercised in such a manner as to operate oppressively on a discrete minority of the group affected. The plaintiff has not alleged that the marketing program is so constitutionally infirm. However, on a record showing that the power conferred on private persons has been exercised oppressively for the advantage of the majority to the disadvantage of the minority or otherwise unreasonably or unfairly, a different question would be presented.

Affirmed.

73 Mich App 212; 251 NW2d 278 (1977) affirmed.

## OPINION OF THE COURT

1. TAXATION — WORDS AND PHRASES — CONSTITUTIONAL LAW.

Taxes are exactions or involuntary contributions of money which are sanctioned by law and enforceable by the courts, which are imposed primarily for public rather than private purposes (Const 1963, art 4, § 32; Const 1963, art 9, §§ 1, 2).

2. TAXATION — "ASSESSMENTS" — WORDS AND PHRASES — CONSTITUTIONAL LAW.

Revenue from taxes inures to the benefit of all, as opposed to exactions from a few for benefits that will inure to the persons or groups "assessed" (Const 1963, art 4, § 32; Const 1963, art 9, §§ 1, 2).

3. TAXATION — "ASSESSMENTS" — WORDS AND PHRASES — CONSTITUTIONAL LAW.

The Agricultural Commodities Marketing Act imposes an "assessment" rather than a tax in specifically stating that funding comes from an assessment collected from each producer of the commodity who is directly affected by the marketing program, that the monies collected are not state funds, and that they are to be disbursed solely for necessary expenses incurred by the marketing programs; the act is structured to apply to and for the benefit of producers of specific commodities (MCL 290.651 *et seq.;* MSA 12.94[21] *et seq.*).

4. TAXATION — "ASSESSMENTS" — WORDS AND PHRASES — CONSTITUTIONAL LAW.

"Assessments", as opposed to taxation, authorized by the Legislature can confer special benefits to a particular group and, at

the same time, create a general benefit for all persons in the state through, for example, stimulation of the economy.

5. TAXATION — "ASSESSMENT" — AGRICULTURAL COMMODITIES MARKETING ACT — WORDS AND PHRASES — CONSTITUTIONAL LAW.

The Legislature has made a rational decision that "assessment", as opposed to taxation, is the reasonable means of effecting the purposes of the Agricultural Commodities Marketing Act; the fact that general benefits, such as stimulating the economy or insuring that only wholesome produce reaches the market, are by-products of the act does not deny that the benefits inure primarily to the "assessed" producers (MCL 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

6. TAXATION — "ASSESSMENTS" — AGRICULTURAL COMMODITIES MARKETING ACT — CONSTITUTIONAL LAW.

The Agricultural Commodities Marketing Act gives the commodity committees the power to "assess" for necessary expenses incident to effecting its regulatory and promotional goals and not the power to tax for general revenue; there is no unconstitutional delegation of the taxing power of the state (Const 1963, art 4, § 32; Const 1963, art 9, §§ 1, 2; MCL 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

7. ADMINISTRATIVE LAW — AGRICULTURAL COMMODITIES MARKETING ACT — CONSTITUTIONAL LAW — DELEGATION OF POWER — REFERENDUM.

The requirement of a referendum for the adoption or termination of a marketing program under the Agricultural Commodities Marketing Act is not an improper delegation of authority where the referendum is carried out under sufficient standards and safeguards provided by the Legislature (MCL 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

8. ADMINISTRATIVE LAW — DELEGATION OF POWERS — STATUTES.

The guiding principles in determining whether a statute provides sufficient standards for the exercise of discretion of an administrative official are: (1) the provision in question should not be isolated but must be construed with reference to the entire act; (2) the standard should be as reasonably precise as the subject matter requires or permits; and (3) if possible the statute must be construed in such a way as to render it valid, not invalid, as conferring administrative, not legislative power, and as vesting discretionary, not arbitrary, authority.

9. ADMINISTRATIVE LAW — AGRICULTURAL COMMODITIES MARKETING
ACT — DELEGATION OF POWERS.

The Agricultural Commodities Marketing Act, when read as a
whole, clearly and sufficiently defines standards to guide grow-
ers, the Director of the Department of Agriculture, and the
commodity committees in the formulation and operation of a
marketing program and provides safeguards for all involved;
the provisions for participation by the growers and the system
of checks and balances in the act and the Administrative
Procedures Act insure that any marketing program under the
marketing act will not be the result of an abdication of author-
ity by the Legislature (MCL 24.201 et seq., 290.651 et seq.; MSA
3.560[101] et seq., 12.94[21] et seq.).

10. ADMINISTRATIVE LAW — AGRICULTURAL COMMODITIES MARKETING
ACT — CONSTITUTIONAL LAW — DUE PROCESS.

The standards in the Agricultural Commodities Marketing Act
for adopting and operating a commodity marketing program
provide sufficient safeguards to comply with the requirements
of constitutional due process (MCL 290.651 et seq.; MSA
12.94[21] et seq.).

.11. ADMINISTRATIVE LAW — AGRICULTURAL COMMODITIES MARKETING
ACT — DELEGATION OF POWERS — SPECIFICITY.

The Agricultural Commodities Marketing Act contains standards
as reasonably precise as the subject matter permits because the
wide range of purposes which may be served by application of
the marketing act demands that the act use general terms
(MCL 290.651 et seq.; MSA 12.94[21] et seq.).

CONCURRING OPINION BY RYAN, J.

See headnotes 1-6.

12. ADMINISTRATIVE LAW — CONSTITUTIONAL LAW — DELEGATION OF
POWERS — STATUTES.

*The judicial test for determining whether the Legislature has
acted properly, within constitutional restraints, when it autho-
rizes an agency to exercise certain powers requires a critical
analysis of the enabling legislation to determine whether the
Legislature has prescribed standards as reasonably precise as
the subject matter requires or permits; the participation of
private persons in the exercise of those powers does not alter
the validity of this test, but merely adds another consideration.*

13. Administrative Law — Agricultural Commodities Marketing Act — Constitutional Law — Delegation of Powers.

The standards in the Agricultural Commodities Marketing Act, although they speak in broad terms, are constitutionally sufficient, being as reasonably precise as the subject matter requires or permits (MCL 290.651 et seq.; MSA 12.94[21] et seq.).

14. Administrative Law — Agricultural Commodities Marketing Act — Constitutional Law — Delegation of Powers — Referendum.

A referendum of agricultural producers for the adoption or termination of a marketing program under the Agricultural Commodities Marketing Act is not an improper delegation of legislative power; it reflects a measured decision by the Legislature to allow those most intimately affected by a marketing program to determine whether that program is the method they choose to effectuate their business goals (MCL 290.651 et seq.; MSA 12.94[21] et seq.).

Concurring Opinion by Levin, J.

See headnotes 1-6.

15. Administrative Law — Constitutional Law — Delegation of Powers — Statutes.

A delegation of law-making power is not necessarily invalid because private persons have a voice in its exercise; however, the power may be exercised in such a manner as to operate oppressively on a discrete minority of the group affected, and would then be constitutionally infirm as applied.

*Warner, Norcross & Judd* (by *Ernest M. Sharpe)* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *Henry J. Boynton,* Assistants Attorney General, for the defendants Director of the Department of Agriculture and Michigan Cherry Promotion and Development Committee.

*Foster, Swift, Collins & Coey, P.C.* (by *James A. White* and *Peter F. McNenly),* for intervening

defendant Michigan Association of Cherry Producers.

WILLIAMS, J. Plaintiff-appellant, Dukesherer Farms, Inc., filed a class action on behalf of all cherry producers in the state of Michigan seeking a permanent injunction against further implementation of the Michigan Cherry Promotion and Development Program instituted pursuant to the Agricultural Commodities Marketing Act, MCL 290.651 *et seq.;* MSA 12.94(21) *et seq.* The complaint further sought a declaration that the Michigan Cherry Promotion and Development Program and the Agricultural Commodities Marketing Act are unconstitutional.

We affirm the decisions of the trial court and the Court of Appeals, find both the program and the act constitutional and therefore deny any right to a permanent injunction.

## I. FACTS

The Agricultural Commodities Marketing Act, MCL 290.651 *et seq.;* MSA 12.94(21) *et seq.* (hereinafter referred to as the Act) became effective March 31, 1966, with the purpose of providing a procedure whereby marketing programs could be established for a wide variety of Michigan's agricultural products. A "marketing program" is defined by the Act as follows:

" 'Marketing program' means a program established by order of the director pursuant to this act, prescribing rules and regulations governing the marketing for processing, distributing, selling, or handling in any manner of any agricultural commodity produced in this state during any specified period and which he determines would be in the public interest." MCL 290.652(i); MSA 12.94(22)(i).

The content of a marketing program is also set forth in the Act:

"Any marketing agreement or program issued pursuant to this act may contain one or more of the following:

"(a) Provisions for establishing advertising and promotional programs.

"(b) Provisions for establishing market development programs.

"(c) Provisions for establishing and supporting supplemental research programs designed to improve the market acceptability of the specific commodity and contribute to the effectiveness of the program.

"(d) Provisions for development and dissemination of market information.

"(e) Provision for contracting with organizations, agencies or individuals for carrying out any of the above activities.

"(f) Provisions for:

"(1) Establishing standards for quality, condition or size for agricultural commodities sold as fresh products for resale or processing and standards for pack and/or container for commodities sold for use as fresh products.

"(2) Inspection and grading of the fresh commodity in accordance with the grading standards so established.

"(g) Provision for determining the existence and extent of any surplus in any marketing period, for any commodity or product, or of any grade, size, or quality thereof, and providing for handling and equitably sharing the cost of such surplus handling among the producers of the commodity. Before provisions under this paragraph are included in any marketing program, particular attention shall be given to determining that Michigan producers affected by the provisions produce a sufficient proportion of the product covered by the provisions for the program to be effective in the particular market toward which the provisions would be applicable.

"(h) Provision for payment for all usable products

purchased from producers according to established grade.

"(i) Provision for exemption of nonparticipating producers." MCL 290.653; MSA 12.94(23).

The Act provides that marketing programs established under it are to be administered by a "commodity committee, to consist of an odd number of members with no less than 5 nor more than 15 * * * producers and handlers or processors * * * directly affected by the marketing program * * * ". MCL 290.657(a); MSA 12.94(27)(a).

The Act further sets forth detailed procedures to be followed in the institution and termination of a marketing program, MCL 290.660-290.663; MSA 12.94(30)-12.94(33). Briefly stated, for the institution of a marketing program the Director of the State Department of Agriculture must receive a petition favoring adoption, signed by 25% or 200, whichever is less, of the producers of a specific agricultural commodity.[1] The Director must then give notice of a public hearing and may appoint a temporary committee to develop the proposed program to be considered at the public hearing. The Director is required to issue a decision based upon his or her findings, including a recommendation approving or disapproving the proposed program within 45 days of the public hearing. The recommendation must contain the full text of any proposed program and be supported by evidence taken at the hearing or by documents of which the Director is required to take official notice.

If the Director of Agriculture recommends the adoption of a particular marketing program, a referendum of affected producers and processors is

---

[1] This is exactly the same number of producers which may, at any time, petition the Director for termination of the program. MCL 290.663; MSA 12.94(33).

required within 45 days. MCL 290.661; MSA
12.94(31). The recommended program goes into
effect if either of the following conditions are met:

"(a) If 66-2/3% or more by number of those voting
representing 51% or more of the volume of the affected
commodity produced by those voting assent to the
proposal.
"(b) If 51% or more by number of those voting
representing 66-2/3% or more of the volume of the
affected commodity produced by those voting assent to
the proposal."

The Act requires that a marketing program
include a:

"definition of terms, purpose of the program, the
maximum rate of assessment, method of collection,
nominating procedure, qualifications, representation
and size of the committee, and other necessary provi-
sions." MCL 290.665; MSA 12.94(35).

The program for a given commodity is to be
funded by an assessment collected from each pro-
ducer of the commodity who is directly affected by
the marketing program. The Act specifies that all
assessments are to be used solely to defray all
program and administrative costs and further re-
quires that each program specify the maximum
assessment to be collected to cover these costs.[2]

---

[2] MCL 290.655; MSA 12.94(25):

"(a) Assessments shall be collected from each producer of any
marketable agricultural commodity produced in this state and di-
rectly affected by a marketing program issued for the commodity to
defray all program and administrative costs except as provided under
subsection (i) of section 3.

"(b) Each program shall specify the maximum assessment to be
collected to cover program and administrative costs.

"(c) For convenience the processors, distributors or handlers of the
commodity may be required to collect and remit producer assess-
ments. Processors, distributors or handlers paying the assessments for

The monies so collected are declared not to be state funds, and are required to be deposited in a bank, allocated to the marketing program under which they are collected, and disbursed for the necessary expenses incurred with respect to each separate marketing program. MCL 290.658; MSA 12.94(28). The same section also provides for auditing of all expenditures and publication of an activity and financial report. Refund of surplus money is provided for in MCL 290.659; MSA 12.94(29).

The Michigan Cherry Promotion and Development Program, (hereinafter referred to as the Program), which provides for the promotion and advertising of cherries grown in this state, meets all the requirements of the Act.

At the present time this program provides for an assessment of $3.75 per ton for tart cherries, $3.00 per ton for sweet cherries and $1.25 per ton for both tart and sweet cherries when those cherries are sold for juice purposes. The Program further provides that these assessments are to be collected by the processors of the cherries and remitted to the Michigan Cherry Promotion and Development Committee. The provisions of the Program, including the above-mentioned assessments, received the approval of the requisite number of cherry producers in a referendum conducted by the Director of the Michigan Department of Agriculture between March 3, 1972 and March 22, 1972. After approval, the cherry Program was put into operation.

---

any producer may deduct the amount from any moneys which they owe to the producers.

"(d) Each program may specify the date after the production of the commodity when the assessment, whether collected by the producers, processors, distributors, or handlers of the commodity, is due in the account of the program on that production. Producers, processors, distributors, or handlers of the affected commodity shall be given notice of the due date at least 6 months in advance of the due date."

Part (d) was added by amendment effective December 15, 1974.

On October 13, 1972, plaintiff-appellant filed a class action on behalf of all cherry producers in the state subject to assessments under the Program. The Michigan Association of Cherry Producers was permitted to intervene as a defendant.

Both the principal and the intervening defendants subsequently filed motions for accelerated judgment based on the theory that plaintiff had failed to comply with the time limits for judicial review found in the Administrative Procedures Act of 1969, MCL 24.304(1); MSA 3.560(204)(1), and therefore, the circuit court was precluded from exercising subject matter jurisdiction. In an opinion dated January 30, 1973, the circuit court granted the motions and dismissed plaintiff's complaint. The Court of Appeals affirmed, *Dukesherer Farms, Inc v Director of the Dep't of Agriculture,* 53 Mich App 489; 220 NW2d 46 (1974), but this Court reversed and remanded the case to the circuit court for consideration of the constitutional challenges raised by plaintiff. 393 Mich 758; 223 NW2d 294 (1974).

In an opinion dated November 6, 1975, the circuit court granted defendants' motion for a summary judgment on the merits of the case. This disposition was affirmed by the Court of Appeals on January 6, 1977. 73 Mich App 212; 251 NW2d 278 (1977). We granted leave to appeal June 2, 1977.

## II. ISSUES

The issues raised in this appeal are: 1) whether the "assessments" authorized by the Agricultural Commodities Marketing Act constitute "taxes" subject to constitutional limitations and restrictions and therefore represent an unconstitutional delegation of the taxing power to producers of

agricultural commodities in violation of the Michigan Constitution, 2) whether the Agricultural Commodities Marketing Act delegates general legislative power to producers of agricultural commodities in violation of the Michigan Constitution, and 3) assuming an affirmative answer to issue 1 or 2, whether previously collected assessments should be returned to plaintiff and its class and whether plaintiff-appellant should be awarded attorneys' fees?

We decide all issues in the negative and thereby affirm the trial court and Court of Appeals.

## III. ASSESSMENT OR TAX

If the levy authorized by the Act is a tax rather than an assessment, there must be specific compliance with the limitations of the Michigan Constitution:

"The legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1.

"The legislature shall impose taxes sufficient with other resources to pay the expenses of state government." Const 1963, art 9, § 1.

"The power of taxation shall never be surrendered, suspended, or contracted away." Const 1963, art 9, § 2.

"Every law which imposes, continues or revives a tax shall distinctly state the tax." Const 1963, art 4, § 32.

As correctly stated by Judge William S. White, Berrien Circuit Court, in his opinion in the instant suit, "[t]axes and assessments do have a number of elements in common. Both are exactions or involuntary contributions of money the collection of which is sanctioned by law and enforceable by the courts. Here, however, the similarity ends". Exac-

tions which are imposed primarily for public rather than private purposes are taxes. See *People ex rel the Detroit & H R Co v Salem Twp Board,* 20 Mich 452, 474; 4 Am Rep 400 (1870). Revenue from taxes, therefore, must inure to the benefit of all, as opposed to exactions from a few for benefits that will inure to the persons or group assessed. *Knott v Flint,* 363 Mich 483, 499; 109 NW2d 908 (1961); *Fluckey v Plymouth,* 358 Mich 447, 451; 100 NW2d 486 (1960).

The Act in question specifically states that funding is to come from an assessment collected from each producer of the commodity who is directly affected by the marketing program. The Act further states that monies so collected are not state funds and are to be disbursed solely for necessary expenses incurred with respect to each separate marketing program. Thus, the Act itself is consistent with the imposition of an assessment rather than a tax; it is structured to apply to and for the benefit of producers of specific commodities.

This is not to say that the proper subject matter for an assessment as opposed to a tax is always easily distinguishable. Levies authorized by the Legislature can confer special benefits on a particular group and, at the same time, create a general benefit for all persons in the state, through, for example, stimulation of the economy.

This was the case in *Milk Marketing Board v Johnson,* 295 Mich 644; 295 NW 346 (1940), which involved constitutional challenges to the Michigan milk marketing law. The law was held unconstitutional on procedural grounds not relevant here. However, this Court stated in regard to the section authorizing payments by distributors for the necessary expenses of local milk marketing committees:

"The board is given power to administer the funds so

collected. The statute requires this check-off to be reasonable and limits the expenditures to the purposes of the act. The check-off provision was questioned in *Reynolds v Milk Commission,* 163 Va 957; 179 SE 507 [1935]. We agree with the holding of that court that *such assessment is not the levying of a tax,* nor is the act a revenue measure. *The provision is merely incident to regulation of the industry and is proper under the police power of the State." Johnson, supra,* 653. (Emphasis added.)

Within a few months of *Johnson,* however, this Court decided *Miller v Michigan State Apple Commission,* 296 Mich 248; 296 NW 245 (1941). The act in question, popularly known as the "Baldwin apple act", imposed a tax upon "putting Michigan-grown apples in the marts of commerce". *Miller, supra,* 252. All monies collected under the act were to " 'be expended exclusively to advertise apples' ". *Miller, supra,* 251. The majority of this Court found the act to be constitutional and found taxation by the state for the purpose of advertising apples to be a public purpose:

"We perceive that the stimulation of so large and important an industry will result in a benefit to the general public well-being, the increased prosperity of the entire apple-growing industry of necessity being reflected throughout the commonwealth. The funds expended are not paid to apple growers or to any other particular individuals or class thereof as was the case in *Michigan Sugar Co v Auditor General,* 124 Mich 674 [83 NW 625 (1900)] appeal dismissed, 185 US 112 [1902]. *We hold that the tax is for a public purpose." Miller, supra,* 255 (emphasis added).

Although the question of whether the levy was an assessment or a tax was not at issue in *Miller,* this Court clearly found that expenditures to increase

the use of apples produced in Michigan were for a public purpose.

Plaintiff finds support for his position in *Miller* and seeks to distinguish *Johnson* on the basis that, unlike the instant case, *Johnson* did not involve levies which would be spent for promotion or to produce increased revenue for those who were required to pay. Plaintiff claims that, because the Act presently in question primarily authorizes expenditures for advertising as in *Miller,* the levies are for a public purpose and the proper subject matter for taxation rather than assessment. This argument ignores the fact that a specific section with which this Court dealt in *Johnson* stated that one of the act's avowed purposes was to cause the increased consumption of milk.

We do not doubt that expenditures for the advertising of a specific commodity to increase the use or consumption of that commodity produced in this state could be viewed as a benefit to all. In the same respect, the imposition of provisions of the Act which allow for the institution of standards of quality and inspection systems insuring that only wholesome produce reaches the market could be viewed as a benefit to all. However, the fact that these general benefits are by-products of the Act does not deny that the benefits inure primarily to the producers. The Legislature has made a rational decision that assessment as opposed to taxation is the reasonable means of effectuation of its purpose, and examination of the underlying circumstances here does not dictate a finding that the Legislature erred. Admittedly, *Johnson* and *Miller* appear to be conflicting precedent for the instant issue, but we are not compelled by dicta in *Miller* to reach a different result.

The instant situation is analogous to other situa-

tions which are commonly deemed the proper subject matter for assessment such as street improvements, drains and sewers. Undoubtedly, such projects bestow incidental benefits upon the general public, but the persons who receive the tangible and most immediate benefits are the ones obligated to pay.

Other courts have examined the distinction between a tax and assessment and their decisions are instructive.

In *United States v Butler,* 297 US 1; 56 S Ct 312; 80 L Ed 477 (1936), the Federal Agricultural Adjustment Act of 1933 was challenged. That particular act was primarily concerned with regulation and reduction of farmland acreage. Incident to such regulation was a levy on processing commodities. The levy was designated a tax and the United States contended that the respondents had no standing to challenge the "validity of the tax". *Butler, supra,* 57. In light of this assertion, United States Supreme Court stated:

"It is inaccurate and misleading to speak of the exaction from processors prescribed by the challenged act as a tax, or to say that as a tax it is subject to no infirmity. A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government. The word has never been thought to connote the expropriation of money from one group for the benefit of another. We may concede that the latter sort of imposition is constitutional when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation. But manifestly no justification for it can be found unless as an integral part of such regulation. The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end. To do this would be to

shut our eyes to what all others than we can see and
understand." *Butler, supra,* 61.

The Court in *Butler* held that there was standing
to challenge the exaction because it was not a true
tax, and that the exaction must fail, partially
because it "invades the reserved rights of the
states". *Butler, supra,* 68.

In effectuation of the purpose of an assessment,
as distinguished from a tax, the spending of sums
acquired through assessment must be rigidly de-
fined and the money collected must be segregated
from all other accounts. In *Memphis Natural Gas
Co v McCanless,* 183 Tenn 635; 194 SW2d 476
(1946), a special state governmental unit was
charged with the supervision, inspection and con-
trol of its public utilities. The governmental unit
was financed entirely from fees exacted from the
utilities based upon gross receipts. The plaintiff
utility company objected to the levy, arguing that
the fee collected was a gross receipts tax. The
Tennessee Supreme Court responded to plaintiff's
objection as follows:

"It is true that the amount of the fees is to be
'measured by the amount of the gross receipts of each
public utility' * * * but the fees are to be kept apart
and deposited in a 'Public Utility Account' * * * and
from this account only expenses of the administration
and supervision of public utilities may be paid. *Use of
funds in the account is limited to this purpose, and
payment of administrative expenses is limited by the
amount of this special fund. * * * Such a levy is a
special assessment for a specific purpose and lacks
essential elements of a tax. * * ** Here the legislature
decided that gross receipts from business done in the
State provided a convenient yardstick for measuring
the fair contribution of the public utility to the admin-
istrative expense fund. * * * *Law dictionaries, text-*

*books and cases from other jurisdictions, make it clear that the essential test to determine whether such fees are, or are not taxes, is whether they are, or are not paid into the general public treasury and disbursable for general public expenses. \* \* \* "* McCanless, supra, 650-651. (Emphasis added.)

Similarly, the provisions of the Michigan Act direct that the accounts be kept apart from the general funds, and the use of the funds is limited to defined and necessary purposes.

In *Wickham v Trapani,* 26 AD2d 216; 272 NYS2d 6 (1966), the Agriculture and Markets Law of New York was challenged on the basis that the imposition of the assessments solely on the growers violated constitutional due process. The court rejected the contention and discussed the nature of the assessment.

"Appellant regards the assessment imposed by the Commissioner as a 'tax' and complains that because he has derived no profit from his apple-raising endeavors he should not be compelled to pay it. It is difficult to perceive any infringement upon his constitutional rights on this basis. *Indeed, the assessment here involved does not appear to be a tax at all but merely a fund-raising measure incidental to a valid regulation and this is true even though the assessment may be the 'heart' of the regulatory order."* Wickham, supra, 218-219. (Emphasis added.)

Plaintiff cites four cases for the proposition that assessments for advertising are taxes. *Conner v Joe Hatton, Inc,* 203 So 2d 154 (Fla, 1967); *Scott v Donnelly,* 133 NW2d 418 (ND, 1965); *Conlen Grain & Mercantile, Inc v Texas Grain Sorghum Producers Board,* 519 SW2d 620 (Tex, 1975); *Robison v Dwyer,* 58 Wash 2d 576; 364 P2d 521 (1961). We do not find these cases to compel a finding that the

assessments in question, although primarily used for advertising, are taxes.

*Conner, supra,* did not involve whether the levy was to be classified as a tax or an assessment; the act in that case was declared unconstitutional on the basis of inadequate standards.

In *Scott,* a levy was authorized under an act similar to the one in the instant case. However, the program and levies were effectuated only as to growers in specific areas of the state. The commodity involved was potatoes which were grown throughout the state and not just in the areas to which the levy applied. The "areas [involved] were not determined by the Legislature and did not constitute either municipal corporations or political subdivisions of the State". *Scott, supra,* 423. The levy was held to be a tax; it conferred no benefits upon the parties required to pay beyond those inuring to potato growers throughout the state. In contrast, under the Michigan Act, special benefits inure to all producers of a particular commodity, and all such producers are assessed.

*Conlen* again involved a challenge to a statute similar to the Michigan statute. Over two dissents representing the views of four justices of the Texas Supreme Court, the court decided that the levy fit within the "occupation tax" provision in the state constitution. That court appeared to limit assessments to costs based on the improvement of land. We do not believe that assessments in this case should be so limited.

Finally plaintiff relies on *Robison, supra.* That case, however, is support for the view that a levy under circumstances similar to the instant case is not a tax. The Washington Supreme Court quoted and relied on its prior decision in *State ex rel Sherman v Pape,* 103 Wash 319; 174 P 468 (1918):

"These funds were not taxes levied and collected for state purposes generally, but were assessments laid upon private lands particularly for the benefits done those private lands. It was not necessary, therefore, that the sums imposed and collected should come into the state treasury as provided by art 7, § 6."

We find that both legal precedent and common sense dictate the finding that the provisions of the Act authorizing the collection of money sufficient to support a marketing program give the commodity committee the power to assess for necessary expenses incident to the effectuation of its regulatory and promotional goals and not the power to tax for general revenue. Incidental benefits to the general public such as enhanced revenue or reputation to the state resulting from increased revenue to the producers of a particular commodity, or enhancement of the public interest through increased and enforceable standardization of grading and quality of a particular commodity, do not change the fact that it is the producer who is the direct and most immediate beneficiary of a program initiated under the Act. We neither feel compelled precedentially nor practically to overrule the legislative judgment in this case.

Because we find the levy in the instant case to be an assessment and not a tax, there is no unconstitutional delegation of the taxing power of this state.

### IV. CONSTITUTIONALITY OF DELEGATION TO PRIVATE INDIVIDUALS?[3]

The Act in question in this case authorizes

---

[3] The standards applicable to delegation were recently dealt with by six members of this Court in *Westervelt v Natural Resources Commission*, 402 Mich 412; 263 NW2d 564 (1978), in which we upheld the delegation of rule-making authority to a public agency.

The WILLIAMS opinion in *Westervelt*, signed by Justices LEVIN and

decisions to be made by persons or bodies other than the Legislature on two different levels. First, the Act places certain powers in the Director of the Department of Agriculture. Second, it places certain powers with the producers.

Appellant's only assertion as to impermissible delegation is based on the fact that under the Act, the producers are the ones who initially petition the Department of Agriculture for potential adoption of a program and vote by referendum for actual adoption or termination of a program. Because of this, appellant asserts that marketing orders are not promulgated by the Legislature but by producers and it is the producers rather than the Legislature who are permitted to determine the existence of a rational nexus between the legislation and a legitimate objective of the state's police power. Therefore, appellant asserts that the Act provides for an unconstitutional delegation of

FITZGERALD, set forth a two-pronged "safeguards, including standards" test for delegation, grounded both in constitutional separation of powers (standards) and constitutional due process (safeguards):

"With respect to the separation of powers, the Legislature does not [improperly] 'delegate' or 'abdicate' its power to an administrative agency if the challenged legislation contains 'standards * * * as reasonably precise as the subject matter requires or permits'. With respect to due process, the Legislature does not delegate power to an administrative agency in such a manner that the legislation 'becomes an open door' to favoritism, discrimination, and arbitrary, uncontrolled discretion on the part of administrative agencies if the challenged legislation contains 'standards * * * as reasonably precise as the subject matter requires or permits.' " (Citations omitted.) *Westervelt, supra*, 438.

Justice RYAN concurred in the result in *Westervelt* but felt that the delegation doctrine is grounded solely in constitutional separation of powers requiring standards, and "the due process question [safeguards] involves a separate and distinct issue * * * ". *Westervelt, supra*, 458. Chief Justice KAVANAGH and Justice COLEMAN concurred in Justice RYAN's view. Justice BLAIR MOODY, JR., took no part in the decision.

Because of this lack of a clear majority in *Westervelt* as to the proper method of analysis, we will rely primarily on the method employed in the prior case of *Dep't of Natural Resources v Seaman*, 396 Mich 299; 240 NW2d 206 (1976).

legislative authority to private individuals which enables those individuals to bind an unconsenting minority.[4]

Appellant's challenge fails, however, on the basis of both prior case law upholding similar legislation and under a thorough analysis of the Act in question based on *Department of Natural Resources v Seaman,* 396 Mich 299; 240 NW2d 206 (1976).

## A. Caselaw

The type of delegation which exists under the Act has survived constitutional challenges before the United States Supreme Court. *United States v Rock Royal Co-operative, Inc,* 307 US 533; 59 S Ct 993; 83 L Ed 1446 (1939); *Currin v Wallace,* 306 US 1; 59 S Ct 379; 83 L Ed 441 (1939). Professor Antieau,[5] in discussing these cases as well as others involving different and impermissible delegation, stated the following:

"There are some available indications as to when the Supreme Court will find delegations permissible or impermissible. * * * Congress cannot delegate any of its powers to private individuals. It cannot, for example, give a group of coal producers the power to make law and enforce it upon others. Nor can it delegate to private individuals in industries to be regulated the power to establish codes of fair competition. However, *Congress can pass a law and prescribe the conditions of its application, including in those conditions the re-*

---

[4] In *Westervelt, supra,* we noted the different forms of delegation, *i.e.,* delegation "to an administrative agency", "delegation of lawmaking and/or judicial power to private groups or persons * * * and legislative delegation of 'non-judicial' power to the judiciary", pp 443-444, fn 21. However, we also noted that such differences in the form of the delegation do not require the adoption of a different method of analyzing the propriety of the delegation.

[5] 2 Antieau, Modern Constitutional Law, p 227.

*quirement of a favorable vote upon referendum by the group intimately affected, such as milk producers or growers of tobacco."* (Citations omitted.)

*Currin v Wallace, supra,* dealt with the Federal Tobacco Inspection Act of 1935, which authorized the Secretary of Agriculture to designate markets at which, after two-thirds of the growers voted in favor of proposed standards, no tobacco could be offered for sale which had not been inspected and graded in accordance therewith.[6]

In a decision upholding the legislation against an attack based on an unconstitutional delegation of legislative authority, Justice Hughes, writing for the majority, stated:

"The argument that there is an unconstitutional delegation of legislative power is equally untenable. This is not a case where Congress has attempted to abdicate, or to transfer to others, the essential legislative functions with which it is vested by the Constitution. * * * *We have always recognized that legislation must often be adapted to conditions involving details with which it is impracticable for the legislature to deal directly.* We have said that—*'The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.* Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.' * * * In such cases 'a

_____

[6] The Secretary of Agriculture was also authorized by the act to investigate the handling, inspection and marketing of tobacco and to establish the standards by which its type, grade, size, condition or other characteristics could be determined. *Currin v Wallace, supra,* 306 US 6.

general provision may be made, and power given to those who are to act under such general provisions to fill up the details.' * * *

"So far as growers of tobacco are concerned, *the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.'* Similar conditions are frequently found in police regulations. * * * This is not a case where a group of producers may make the law and force it upon a minority (see *Carter v Carter Coal Co,* 298 US 238, 310, 318 [56 S Ct 855; 80 L Ed 1160 (1936)]) * * *. Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions." *Currin, supra,* 306 US 15-16 (cited with approval in *Milk Marketing Board v Johnson,* 295 Mich 644, 660; 295 NW 346 [1940]). (Emphasis added.)

Similarly, the United States Supreme Court upheld the Agricultural Marketing Agreement Act of 1937 which " * * * was aimed at assisting in the marketing of agricultural commodities" in *Rock Royal Co-operative, supra,* p 543, against an attack based on unconstitutional delegation. The act provided that a marketing order may become effective when the Secretary of Agriculture determined that the issuance of the order is approved by two-thirds of the producers interested or by interested producers of two-thirds of the volume produced for the market of a specified production area. The Secretary was empowered to conduct a referendum to ascertain whether such approval of two-thirds existed. The majority stated,

"The objection is made that this is an unlawful delegation to producers of the legislative power to put an order into effect in a market. In considering this

question, we must assume that the Congress had the power to put this Order into effect without the approval of anyone. Whether producer approval by election is necessary or not, a question we reserve, a requirement of such approval would not be an invalid delegation." *Rock Royal Co-operative, supra,* 307 US 577-578.

The requirement of a referendum, therefore, is not without strong precedent,[7] and need not constitute improper delegation, but can simply be a measured decision by the Legislature to allow those most intimately affected to decide whether forming a marketing program as presented in the Act and approved by the Director is a proper manner in which to effectuate their business goals. As long as this is carried forth under sufficient standards and safeguards set up by the Legislature under the Act, or other legislation applicable thereto, there is no improper delegation of author-

---

[7] The United States Supreme Court recently found there to be no delegation when an issue of relevance to city residents was submitted to a vote by those residents. In issue was a city charter which required ratification by 55% of the voters for a proposed land use change. The Court stated the following:

"A referendum *cannot,* however, *be characterized as a delegation of* power. Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create. * * * In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature." (Citations omitted.) *Eastlake v Forest City Enterprises, Inc,* 426 US 668, 672; 96 S Ct 2358; 49 L Ed 2d 132 (1976).

The Court further stated:

"Courts have frequently held in other contexts that a congressional delegation of power to a regulatory entity must be accompanied by discernible standards, so that the delegatee's action can be measured for its fidelity to the legislative will. * * * Assuming, *arguendo,* their relevance to state governmental functions, these cases involved a delegation of power by the legislature to regulatory bodies, which are not directly responsible to the people; this doctrine is inapplicable where, as here, rather than dealing with a delegation of power, we deal with a power reserved by the people to themselves." (Citations omitted.) *Eastlake, supra,* 426 US 675.

We do not decide the issue on this precedent but choose to go forth and examine whether proper standards and safeguards exist.

ity. See *Oakman v Wayne County Supervisors,* 185
Mich 359; 152 NW 89 (1915).

## B. Standards

In reviewing the standards as required by *Seaman,* certain

" * * * guiding principles have evolved in Michigan
jurisprudence to assist in making a determination
* * *

"First, the act in question must be read as a whole;
the provision in question should not be isolated but
must be construed with reference to the entire act.
* * *

"Second, the standard should be 'as reasonably pre-
cise as the subject matter requires or permits'. * * *

"The preciseness of the standard will vary with the
complexity and/or the degree to which subject regu-
lated will require constantly changing regulation. * * *

"Third, if possible the statute must be construed in
such a way as to 'render it valid, not invalid', as
conferring 'administrative, not legislative' power and as
vesting 'discretionary, not arbitrary, authority'." (Cita-
tions omitted.) *Dep't of Natural Resources v Seaman,*
396 Mich 299, 309; 240 NW2d 206 (1976).

## 1. Act When Read as a Whole.

The Act, when read as a whole, clearly and
sufficiently defines standards to guide growers, the
Director of the Department of Agriculture and the
commodity committee in the formulation and oper-
ation of a program, and provides safeguards for all
involved.

While the ability to propose a program or
amendments to an existing program rests solely
with a given percentage of affected growers, there
can be no program unless it contains statutory

requirements, is processed as required by statute and is approved by the Director. The Director may require a report of all names and addresses of producers from handlers or processers. Further, a public hearing with notice must be held to receive the views of the producers and within 45 days thereof the Director must issue a complete report with all findings and recommendations.

If the Director approves the program, it is put to a referendum. MCL 290.660-290.663; MSA 12.94(30)-12.94(33).

If a program is approved by referendum, the continuing duties of the Director are set forth in MCL 290.664; MSA 12.94(34) as well as the types of provisions that may be covered by a marketing agreement, MCL 290.653; MSA 12.94(23), and the duties of a commodity committee, MCL 290.657; MSA 12.94(27).

All proposed programs must include specified terms including the maximum assessment rate, MCL 290.665; MSA 12.94(35), and monies can be disbursed only for necessary expenses. MCL 290.658; MSA 12.94(28). There is also provision for refund of any money not so expended. MCL 290.659; MSA 12.94(29). At all stages, the Administrative Procedures Act applies, MCL 24.201, *et seq.;* MSA 3.560(101) *et seq.*

Such statutory provisions clearly set forth in the Act provide sufficient standards to insure that the persons affected will be protected and that any program resulting therefrom will not be the result of an abdication of authority by the Legislature, but will be in careful compliance with the legislative intent and power.[8]

---

[8] We also find these standards provide sufficient safeguards to comply with the requirements of constitutional due process.

## 2. Standards as Reasonably Precise as the Subject Matter Permits.

The Act was drafted to permit utilization by the producers of a number of different agricultural commodities. By necessity, therefore, some flexibility must exist to permit effectuation of this purpose. This was explained by the circuit court in its decision in the instant case:

"It is true that the Act utilizes general terms and not specifics. The subject matter, however, demands such a treatment. Certain commodities subject to periodic surplusage must be rigidly controlled since further market expansion is impossible. Producers of other commodities may choose to solve their marketing problems through penetration into previously untapped areas. New hybrids or technical innovations may cause a radical change in market structures within a brief period of time. The Act must be flexible enough to deal with both the foreseeable and unforeseeable while at the same time defining with reasonable specificity those actions which are permitted in response thereto. Through passage of the Act, the Legislature has expressed its determination that any commodity program which complies with the standards set forth in the statute will effectuate the promotion of the general welfare."

When viewed in light of the wide range of purposes for which producers may benefit by application of the Act, it is clear that it contains as much specificity as is practical. The Legislature has effectuated its purpose with standards as reasonably precise as the subject matter permits.

## 3. Act Must Be Construed as Valid if Possible.

In light of the above findings, it is without difficulty that we find the Act valid. The legislatively provided guidelines and standards which are

" * * * necessary to minimize the opportunity for abuse of discretion as well as to adequately protect the interests of those affected by the regulations", *Seaman, supra,* 313, are present.

The above analysis of specific provisions of the Act demonstrates that the producers must actively participate in all stages of development and effectuation of a marketing program. Further, a system of checks and balances is provided among producers, the Director of the Department of Agriculture and members of the commodity committee to insure not only compliance with the Act, but implementation of an objective marketing program that will meet the needs of those to whom it applies.

Because of our findings in favor of appellees on issues 1 and 2 (see parts III and IV), there is no need to reach issue 3; appellant is neither entitled to a refund of assessments previously paid nor attorneys' fees.

## V. Conclusion

We find that the Act in question authorizes assessments, not taxes, for the purpose of operating a marketing program and does not unconstitutionally delegate legislative authority to producers of commodities.

No costs, a public question being at issue.

Fɪᴛᴢɢᴇʀᴀʟᴅ and Bʟᴀɪʀ Mᴏᴏᴅʏ, Jʀ., JJ., concurred with Wɪʟʟɪᴀᴍs, J.

Rʏᴀɴ, J. *(to affirm).* I concur in Part III of Justice Wɪʟʟɪᴀᴍs' opinion in which he concludes that the levy which is challenged in this suit is an assessment, not a tax, and thus the Agricultural

Commodities Marketing Act[1] (hereafter the Act) does not unconstitutionally delegate the taxing power of this state. I also agree that the Act does not provide for an unconstitutional delegation of legislative authority to private individuals, but I do not agree with the method Justice WILLIAMS employs for analyzing this second question.

As I stated in *Westervelt v Natural Resources Commission,* 402 Mich 412, 455; 263 NW2d 564 (1978), the judicial test for determining whether the Legislature has acted properly, within constitutional constraints, when it authorizes an agency to exercise certain powers requires a critical analysis of the enabling legislation to determine whether the Legislature has prescribed "standards * * * as reasonably precise as the subject matter requires or permits". The participation of private persons in the exercise of those powers does not alter the validity of this test. It merely adds an additional consideration.

An analysis of the statute challenged here leads to the conclusion that it does comply with the requisite standards test.

Beginning with the title to the Act itself, broad standards are outlined that express a legislative policy decision and impose limits on that policy. At the time this suit was instituted the title to the Act read:

"An act relating to the marketing of agricultural commodities; to provide for marketing programs, agreements, referendums by producers, assessments on producers, and commodity committees; and to prescribe the functions of the director of the department of agriculture relative thereto including powers of enforcement of this act."

[1] MCL 290.651 *et seq.;* MSA 12.94(21) *et seq.*

The programs, procedures and functions outlined in the title are more specifically defined in the various sections of the Act. Of particular importance to the challenge before this Court are the following sections.

In § 2 of the Act, a marketing program is defined as "a program established by order of the director pursuant to this act, prescribing rules and regulations governing the marketing for processing, distributing, selling, or handling in any manner of any agricultural commodity produced in this state during any specified period and which he determines would be in the public interest". MCL 290.652(i); MSA 12.94(22)(i).

The permissible provisions that a marketing program may contain are carefully prescribed, and limited, in MCL 290.653; MSA 12.94(23), the relevant portions of which are set forth in the statement of facts portion of Justice WILLIAMS' opinion.

Another section of the Act expressly requires any program to specify the maximum assessment to be collected to cover program and administrative costs. MCL 290.655(b); MSA 12.94(25)(b).

In addition, the program must provide for the establishment of an administrative commodity committee and must include provisions for nominating procedures, qualifications, representation, term of office and the size of the committee. The duties and responsibilities of the committee must be prescribed in the program and must include certain specified administrative duties and responsibilities to the extent they are applicable. MCL 290.657; MSA 12.94(27).

The Act defines the duties of the Director of the Department of Agriculture with respect to any marketing program, MCL 290.664; MSA 12.94(34), including insuring the program is self-supporting,

supervising committee activities, coordinating the administrative activities of the committee and the department and cooperating with other state and Federal authorities.

Finally, the Act requires any marketing program to contain a "definition of terms, purpose of the program, the maximum rate of assessment, method of collection, nominating procedure, qualifications, representation and size of the committee, and other necessary provisions". MCL 290.665; MSA 12.94(35).

Although, admittedly, these standards speak in broad terms, I find they are constitutionally sufficient, being "as reasonably precise as the subject matter requires or permits". As the trial judge in this case so aptly stated,

"It is true that the Act utilizes general terms and not specifics. The subject matter, however, demands such a treatment. Certain commodities subject to periodic surplusage must be rigidly controlled since further market expansion is impossible. Producers of other commodities may choose to solve their marketing problems through penetration into previously untapped areas. New hybrids or technical innovations may cause a radical change in market structures within a brief period of time. The Act must be flexible enough to deal with both the foreseeable and unforeseeable while at the same time defining with reasonable specificity those actions which are permitted in response thereto. Through passage of the Act, the Legislature has expressed its determination that any commodity program which complies with the standards set forth in the statute will effectuate the promotion of the general welfare."

There remains, however, one further consideration. Plaintiffs challenge this Act as an unconstitutional delegation of legislative powers to private individuals because under the Act, agricultural

producers initially petition the Director of the Department of Agriculture for consideration of the adoption of a program, MCL 290.660; MSA 12.94(30), and then vote by referendum for the actual adoption or termination of a program. MCL 290.661; MSA 12.94(31) and MCL 290.663; MSA 12.94(33).

I agree with Justice WILLIAMS that the required referendum reflects a measured decision by the Legislature to allow those most intimately affected by a marketing program to determine whether that program is the method they choose to effectuate their business goals. Such a referendum does not constitute an improper delegation of legislative power. See *United States v Rock Royal Co-operative, Inc,* 307 US 533; 59 S Ct 993; 83 L Ed 1446 (1939); *Currin v Wallace,* 306 US 1; 59 S Ct 379; 83 L Ed 441 (1939).

There is no need to address the third question.

The Court of Appeals is affirmed.

No costs, a public question being at issue.

COLEMAN, C.J., and KAVANAGH, J., concurred with RYAN, J.

LEVIN, J. *(concurring).* I concur with the disposition of the cause reflected in the opinions of my colleagues.

Dukesherer Farms contends that the marketing act is unconstitutional on its face, and that the cherry producers' marketing program is per se invalid. While I agree with my colleagues that those claims should be rejected, the act and the program might, nevertheless, be unconstitutional as applied to Dukesherer Farms or some other cherry producer.

Although a delegation of law-making power is

not necessarily invalid because private persons have a voice in its exercise, the power may be exercised in such a manner as to operate oppressively on a discrete minority of the group affected.[1]

Dukesherer Farms has not alleged that the marketing program is so constitutionally infirm. There is no showing that the committee is biased, that money is expended on programs which do not benefit Dukesherer Farms, that some cherry producers benefit to the detriment of others, that the costs of the program are unfairly assessed among the various producers, that producers of one type of cherry or from one region prevail over the others, or other claim that the program is somehow unfair or unreasonable. Nor is it claimed that the act or program does not provide Dukesherer Farms with adequate safeguards or procedures to challenge committee action.

On a record showing that power conferred on private persons has been exercised oppressively for the advantage of the majority to the disadvantage of the minority or otherwise unreasonably or unfairly, a different question would be presented.

---

[1] See Nowak, Rotunda & Young, Constitutional Law (St. Paul: West Pub, 1978), pp 146, 151, 501-502; 1 Davis, Administrative Law Treatise (2d ed), § 3:12, pp 193-198 ("The case law has not crystallized any consistent principles"). Jaffe, *Law Making by Private Groups,* 51 Harv L Rev 201, 247-253 (1937). See, generally, Liebmann, *Delegation to Private Parties in American Constitutional Law,* 50 Ind L J 650 (1975). *Cf. United States v Carolene Products Co,* 304 US 144, 152, fn 4; 58 S Ct 778; 82 L Ed 1234 (1938).